Richard A. Steele, Plaintiff in error,

v.

State of Wisconsin, Defendant in error.†

Supreme Court

*No. 77–061–CR. Argued November 28, 1978 and November 7, 1979.*
*—Decided June 27, 1980.*
(Also reported in 294 N.W.2d 2.)

† Motion for reconsideration denied, without costs, on August 11, 1980. Abrahamson and Steinmetz, JJ., took no part.

For the plaintiff in error the cause was argued by *Ruth S. Downs,* deputy state public defender, with whom on the briefs was *Howard B. Eisenberg,* state public defender. Additional briefs were filed by *Richard L. Cates,* state public defender, and *Ruth S. Downs,* assistant state public defender.

For the defendant in error the cause was argued by *Pamela Magee-Heilprin,* assistant attorney general, with whom on the brief and additional brief was *Bronson C. La Follette,* attorney general.

Amicus curiae brief was filed on behalf of the Legal Assistance to Institutionalized Persons Program by *Frank J. Remington,* of Madison.

Amicus curiae brief was filed on behalf of the National Association of Criminal Defense Lawyers by *James R. Glover, James M. Shellow* and *Shellow & Shellow* of Milwaukee.

HEFFERNAN, J. Richard A. Steele was charged and found guilty of the first degree murder of his wife, Joan. After a bifurcated trial in response to appropriate pleas, a jury found him guilty and found that he did not have a mental disease or defect which would exonerate him of criminal responsibility. Judgment of conviction was entered on July 22, 1974.

Appeal was brought on the grounds that the trial court erred when it excluded, at the guilt phase of the trial, expert opinion testimony that Steele lacked the capacity to intend to kill his wife. The appeal was predicated on the theory that Wisconsin's rule excluding expert testimony in respect to the defendant's mental state at the guilt phase of the bifurcated trial deprived him of the right to offer a defense.

While the case was pending on appeal, the United States Court of Appeals decided *Hughes v. Mathews,* 576 F.2d 1250 (7th Cir., June 6, 1978). *Hughes* reversed a Wisconsin conviction because, "by instructing the jury to presume intent if not rebutted, and by excluding psychiatric evidence offered to rebut the presumption, Wisconsin set up a conclusive presumption which unconstitutionally relieved the prosecution of the burden of proving the element of specific intent beyond a reasonable doubt." *Hughes* at 1255. [1]

Following the *Hughes* mandate of the Seventh Circuit, this court, on June 30, 1978, decided *Schimmel v. State,* 84 Wis.2d 287, 267 N.W.2d 271. Although *Hughes* related

---

[1] The Court of Appeals appeared to assume that other relevant evidence bearing on intent was excluded by the rule. This assumption is incorrect.

only to a single-phase trial and expressly reserved the applicability of its holding in respect to a bifurcated trial, this court, incorrectly we now conclude, extended the rationale of *Hughes* to *Schimmel*, where there was a trial based on the bifurcated-sequential order of proof mandated by sec. 971.175, Stats. We held in *Schimmel* that, during the guilt phase of a bifurcated trial, competent psychiatric evidence relevant to the defendant's mental state at the time of the crime was admissible and that the refusal to admit such evidence for the purpose of rebutting the presumption of intent was prejudicial error.

Close on the heels of *Schimmel* came Steele's predictable motion for summary reversal. That motion was denied, and the appeal was argued on its merits during the 1978 term of court. Shortly before the intended release of the opinion in June of 1979, the United States Supreme Court decided the cases of *Ulster County Court v. Allen,* 442 U.S. 140 (1979), and *Sandstrom v. Montana,* 442 U.S. 510 (1979). Because of the potential impact of these opinions, and because of other problems, not briefed by the parties, which had surfaced during the course of the court's consideration, this court, on June 29, 1979, ordered further briefs and oral argument. The parties were asked to address themselves to the following questions:

"1. Whether, following *Schimmel v. State,* 84 Wis.2d 287, 267 N.W.2d 271 (1978), and *Hughes v. Mathews,* 576 F.2d 1250 (7th Cir. 1978), a bifurcated trial is workable when the defendant wishes to present psychiatric testimony on the issue of capacity to form the specific intent required for first-degree murder and also relies on the defense that he is not guilty by reason of mental disease or defect?

"2. Whether a defendant wishing to present psychiatric testimony on the issue of specific intent to commit murder should be required to give notice to the state

that such testimony will be offered in order for the testimony to be admissible?

"3. Whether an instruction to the jury that the law presumes that a person intends the ordinary consequences of his voluntary acts is constitutionally infirm in view of *Sandstrom v. Montana* [442 U.S. 510] (1979). 47 U.S.L.W. 4719?"

The case was reargued in its new posture in November of 1979.

On the appeal in the posture originally brought three questions were posed:

1. Is expert evidence in respect to the mental capacity to form an intent to kill admissible in the guilt phase of a bifurcated trial for first degree murder.

2. In the instant case, was the proffered testimony of a psychiatrist, a psychologist, and a psychiatric social worker admissible for this purpose.

3. Under the facts revealed in this record, should the jury have been instructed on second degree murder, as well as first degree murder.

We conclude that our decision in *Schimmel, supra,* to apply the rationale of *Hughes, supra,* to a bifurcated trial was incorrect, and we expressly overrule that portion of *Schimmel.* Accordingly, based on the rationale of *State ex rel. La Follette v. Raskin,* 34 Wis.2d 607, 150 N.W.2d 318 (1967); *Curl v. State,* 40 Wis.2d 474, 162 N.W.2d 77 (1968); and *State v. Hebard,* 50 Wis.2d 408, 184 N.W.2d 156 (1971), we conclude that expert opinion evidence in respect to Steele's mental capacity to form an intent was properly excluded in the guilt phase of the trial. Because we conclude that expert testimony was inadmissible, we do not have reason to answer either the second or third question.

We set forth only the skeletal facts pertinent to this appeal.

The record shows that the defendant, Richard Steele, did not dispute the fact that he shot his wife on February 11, 1974, and that she died from the gunshot wounds. His defense in the guilt phase of the trial was that he did not intend to kill her.

Prior to trial on the question of guilt, it was stipulated Steele bought a .22 caliber revolver and shells on the morning of the killing, that he then went to the Emil Hanson residence in Sparta, Wisconsin, where his estranged wife and child were living, and he there fired six shots into the body of his wife and that she died almost immediately thereafter.

It was also stipulated that Richard and Joan Steele were separated, although no legal proceeding for divorce or separation had been commenced. They were the parents of a son, Richard A. Steele, Jr., who was temporarily in a foster home, the Emil Hanson residence, where Joan Steele was also living at the time of the killing.

Prior to the death of Joan Steele, she had been receiving hospital psychiatric care. Apparently Steele expected that Joan would return to the couple's home upon being discharged from the hospital. On January 28, 1974, he learned, however, that Joan was temporarily living at the foster home with the couple's child. On that day he went to the Monroe County Welfare Office and saw Janet Frost, a social worker, to get an explanation of Joan's residence in the foster home. Frost testified that Steele became angry when she attempted to explain the temporary residence, and he threatened that, if Joan stayed there, he would get a gun and blow her head off.

On February 4, 1974, Joan and Richard Steele had a joint conference at the Gundersen Clinic in La Crosse. According to Steele, the session began with Dr. Anderson stating, "I'm not going to counsel—I think you two

should just get a divorce." This angered Steele, and after the conference Steele struck his wife in the face and knocked her to the ground. Later in the day, Steele saw Frost and he told her, "You can't guard her all the time. I'll get her sooner or later."

On February 5, 1974, the county judge of Monroe county awarded the custody of the child to the Monroe County Welfare Department, with the placement to continue in the Hanson residence. That afternoon, Steele went to Frost's office and there made the threat that, if he was not allowed to see his son, "there would be bodies from here to Winona." He also threatened to kill his wife. He later returned to Frost's office and stated that he did not mean these threats and that he made them because he had been drinking. He also went to see Dennis C. Stamberger, a psychiatric social worker at the Monroe County Guidance Clinic, and Steele told Stamberger that he was sorry that he struck his wife, that he still loved her, and that he did not mean the threats.

On February 7, Steele attempted to make arrangements for a twenty-four-hour visitation with the child on February 11, the child's third birthday. The social worker, Frost, said it would be up to the county judge. When Steele visited the judge, he was told that the doctor had recommended against it.

There was additional evidence produced which showed that Steele, who was a cab driver, drove his car with extreme recklessness following the interview with the judge. A cab customer stated that he ran off the road several times and that he looked "wild."

He had nothing to eat from 1:30 p.m. on Saturday until the shooting on Monday morning. On Sunday evening, according to the testimony of his mother, he was very upset, sat on a couch holding a blanket and was "hollering and crying." He took four Valium tablets and two Mellaril tablets that evening.

On Monday morning, he went to see Stamberger, the psychiatric social worker, who said that Steele was very upset, cried in the office, and looked tired. He again went to see the county judge, who again refused to allow him to visit the child. Steele then went to a sporting goods shop and bought a .22 caliber revolver. He then went to the Hansons to see his son.

When Joan Steele appeared, she and Richard became embroiled in an argument. Mrs. Hanson became alarmed and left the house to call the police. As the police approached the house, they heard gunshots. They entered the house to find Joan Steele dead on the floor, with the defendant standing next to her holding the handgun. There was testimony that Steele appeared to be confused and did not seem to understand that his wife was dead. The chief of police stated that Steele appeared as though he were trying to figure out what he had done. The other officer at the scene stated that Steele appeared to be "realizing" what he had done.

Extensive psychiatric and personal history in respect to Steele was introduced without objection by the defense at the guilt phase of the trial. It showed that he had a long history of psychiatric and social problems, that he had been placed in an institution for disturbed children, and that he had been in a boys' school and in four foster homes. He spent more than a year in Mendota State Hospital beginning in 1960. He enlisted in the Navy in 1963; but after five weeks in a regular unit he was placed in a psychiatric unit, and he was subsequently discharged. Upon discharge, he was readmitted to Mendota State Hospital. There was also evidence to show that Steele was a compulsive gambler and that he had gone on at least five gambling binges at Las Vegas. The purpose of all of this evidence was to cast doubt upon the defendant's intent to kill. This evidence, of-

fered for the purpose of rebutting the presumption, was admitted with no objection by the state.

In the guilt phase of the trial, the defense offered three expert witnesses who would have given an opinion about Steele's capacity to form an intent to kill his wife. Following formal offers of proof in respect to the testimony of Dr. Edward S. Orman, a psychiatrist, and Dennis C. Stamberger, the psychiatric social worker, the proposed expert psychiatric opinion evidence was excluded upon the state's objection. The record also shows that the defendant intended to call a psychologist on the issue of the defendant's capacity to form an intent to kill. A formal offer of proof was not permitted, because this potential witness was not present in the courtroom. Looking at the record as a whole, we conclude, however, that the testimony of the psychologist was excluded for the same reason that the trial judge excluded the testimony of the psychiatrist and the psychiatric social worker—that under Wisconsin law psychiatric or other testimony on the defendant's capacity to form an intent was inadmissible during the guilt phase of the trial.

While the record reveals that objection also was made to the testimony of the psychiatrist and the psychiatric social worker on the basis that sufficient foundation for their testimony had not been shown, the record demonstrates that the controlling reason for the exclusion of the testimony was the judge's belief that such testimony was inadmissible during the guilt phase of the trial.

In so ruling, the trial court applied the then clear rule that psychiatric testimony concerning the defendant's capacity to form the specific intent to kill required for first degree murder was inadmissible in the first, or guilt, phase of a bifurcated trial. *Sprague v. State,* 52 Wis.2d 89, 187 N.W.2d 784 (1971) ; *State v. Anderson,* 51 Wis.2d 557, 187 N.W.2d 335 (1971).

Since the date of Steele's trial in 1974, *Sprague* and *Anderson* and other cases adopting the same rule were

expressly overruled in *Schimmel v. State,* 84 Wis.2d 287, 302, 267 N.W.2d 271 (1978). This court in *Schimmel* held that competent psychiatric testimony relevant to the defendant's state of mind at the time of the crime is admissible during the guilt phase of a bifurcated trial. *Schimmel* relied upon *Hughes v. Mathews,* 576 F2d 1250 (7th Cir. 1978).

Were we to rely upon the *Schimmel* interpretation of *Hughes,* we would be obliged to hold that the psychiatric opinion evidence offered in the guilt phase of Steele's trial was clearly admissible and that its exclusion constituted prejudicial error warranting a new trial. We believe, however, that *Schimmel* incorrectly applied the *Hughes* rationale and extended it to the bifurcated trial, a circumstance not considered by the United States Court of Appeals. An analysis of *Hughes* is, therefore, appropriate.

Hughes' conviction had originally been affirmed by this court in *Hughes v. State,* 68 Wis.2d 159, 227 N.W. 2d 911 (1975). Following our decision, the federal district court granted a writ of habeas corpus, and that order was affirmed by the Court of Appeals in *Hughes v. Mathews, supra.* The United States Court of Appeals pointed out that, at the trial, in accordance with well established Wisconsin law, psychiatric testimony concerning Hughes' mental state and his capacity to form an intent to kill at the time of the alleged crime was excluded.

The Court of Appeals analyzed Wisconsin cases and pointed out that Wisconsin has established what has been denominated a "rebuttable" presumption of intent: " 'The law presumes a person intends the natural and probable consequences of his own acts but the presumption may be rebutted.' " 576 F.2d at 1253. In the *Hughes* case, the Wisconsin trial court instructed the jury that, "when there are no circumstances to prevent or rebut the presumption, the legal and natural presumption is that death was intended." *Id.* at 1253. The same presumption

and the same instruction to the jury were employed in the instant case.

The United States Court of Appeals stated that the use of this presumption, "coupled" with the established rule of *Sprague* and other cases which excluded all psychiatric evidence tending to show a lack of capacity to form the specific intent to kill, relieved the state of the necessity of proving the intent element of the crime of first degree murder.[2] The coupling of the presumption with the rule of evidence excluding testimony to show a lack of capacity, in effect, the Court of Appeals asserted, created an irrebuttable presumption, which unconstitutionally relieved the state of the burden of proving the element of specific intent to kill—the element which distinguishes first degree murder from other degrees of homicide.

Although the *Hughes* case involved only a single-stage trial on a plea of not guilty, *Schimmel* applied the reasoning of *Hughes* to the bifurcated trial where the plea was not guilty and not guilty by reason of mental disease or defect.

It is in this respect—the application of *Hughes* to the bifurcated trial situation—that we conclude we erred in *Schimmel*. The *Hughes* court considered two facets of the problem presented in that case. Initially, it focused on the presumption of intent, which was used to instruct the jury. That instruction provided:

" 'The law presumes a person intends the natural and probable consequences of his own acts but the presumption may be rebutted.' . . . when there are no circumstances to prevent or rebut the presumption, the legal

---

[2] This proposition in itself is erroneous, for our rule excluded only expert opinion evidence on mental state. It did not exclude other competent or relevant evidence. The United States Court of Appeals apparently leaped to the conclusion that only expert psychiatric opinion evidence could cast doubt upon a defendant's specific intent. This is erroneous and illogical.

and natural presumption is that death was intended."
*Hughes, supra* at 1253.

The United States Court of Appeals did not attack this
presumption and concluded it was a rebuttable presump-
tion when viewed alone. The crux of the problem and the
rationale which compelled the Court of Appeals' rever-
sal of *Hughes* was that, by instructing the jury that all
persons are presumed to have intended the consequences
of their acts, unless facts or circumstances rebut the pre-
sumption, and then prohibiting a defendant from pre-
senting those facts, an irrebuttable presumption was
fashioned which relieved the prosecution of the burden
of proving the intent element of the crime. It is clear
that, in the context of the *Hughes* facts, as viewed by the
Seventh Circuit panel, the United States Court of Ap-
peals was arguably correct.[3] In that particular situa-
tion, whatever the validity of the presumption when
viewed alone, when it was coupled with the exclusionary
rule (assuming, as did the United States Court of Ap-
peals, that it had the effect of denying admission of any
evidence of intent), a mandatory or conclusive presump-
tion would improperly relieve the state of its burden of
proof. This does not mean, even under the Court of Ap-
peals' rationale, that either the presumption in itself or
the rule excluding psychiatric evidence is necessarily, and
in all circumstances, improper. It is clear that, in *Hughes,*
the presumption was not in itself attacked.

Since *Hughes* and *Schimmel,* the constitutionality of
the presumption has been upheld by two decisions of
the Wisconsin court system: *Muller v. State,* 94 Wis.2d

---

[3] Again, we emphasize that the Court of Appeals swept too
broadly, for there was substantial evidence of a non-expert nature
that was admitted at the guilt phase that could have cast doubt
on Steele's intent.

450, 289 N.W.2d 570 (1980) ; and *Genova v. State,* 91 Wis.2d 595, 283 N.W.2d 483 (Ct. App., 1979). These cases specifically dealt with the standards of *Ulster County* and *Sandstrom, supra.* It should be noted in passing, however, that each of these cases, although upholding the constitutionality of the same presumption used in *Hughes* and in this case *(Steele),* referred to the replacement presumption language adopted on September 30, 1977, by the Uniform Criminal Jury Instructions Committee. *Genova* specifically advised trial courts to adopt for future use the revised instruction. In any event, it is clear that the presumption in respect to which the jury was instructed in the present case and in *Hughes* was not in itself sufficient to make the result suspect or to warrant reversal.

The other facet of *Hughes* concerned the exclusion of psychiatric opinion evidence. The *Hughes* court, in discussing the exclusion of psychiatric evidence, said that, "The exclusion of psychiatric evidence offered to show that the petitioner lacked the capacity to form specific intent to kill the two victims, is, by itself, constitutionally infirm." (at 1255) Nevertheless, the *Hughes* court specifically disavowed any attempt "to further 'constitutionalize' the law of evidence by constructing a constitutional right to introduce psychiatric testimony." (at 1259) It further went on to say :

"We have also recognized the due process right of the defendant to present relevant and competent evidence *in the absence of a valid state justification* for excluding such evidence." (Emphasis supplied.) (at 1259)

The latter statement is a clear reference to the state's argument in *Hughes* that excluding psychiatric testimony on the question of intent was necessary to insure the integrity of Wisconsin's bifurcated trial system. In cursorily bypassing that point, the *Hughes* court said :

"However, confining ourselves to the facts of this case, the petitioner withdrew his plea of not guilty by reason of mental disease or defect and, consequently, there was no second trial of that issue. Thus, the State's concern that admission of psychiatric testimony during the guilt portion of trial would result in duplication of evidence and eliminate the need for bifurcated trial . . . is not applicable here. Also not involved is the fear that the petitioner's fifth amendment rights would be jeopardized if incriminating statements given during a pre-trial psychiatric examination were used by the prosecution at the guilt phase of trial." (at 1259)

It is thus absolutely clear that the rationale utilized by the United States Court of Appeals in *Hughes* did not deal with the problem posed in *Schimmel,* the bifurcated trial, nor with the problem which has again emerged in the instant case. It is apparent then that *Schimmel* went too far when it assumed that *Hughes* compelled the abandonment of the state's previously carefully enunciated justification for the exclusion of psychiatric testimony in the guilt phase of the trial.

We, accordingly, overrule *Schimmel* in that respect and reinstate those cases purportedly overruled in *Schimmel* which exclude such evidence. We do so because we conclude that repeated reasoned statements of this court have amply demonstrated a sufficient state justification for the exclusion of expert opinion testimony on mental capacity to form an intent in the guilt phase of a bifurcated trial.

In the first place, it should be noted that Wisconsin has for over one hundred years been concerned with the management of a bifurcated trial. As early as 1878, ch. 191, Rev. Stats., secs. 4697–699, provided for the trial of the plea of insanity prior to the determination of the general question of guilt. Although the original statutory bifurcation was abandoned in 1911, an interim case— *Bennett v. State,* 57 Wis. 69, 78, 14 N.W. 912 (1883)—

upheld bifurcation, stating that such procedure was "commendable as being the most practical and convenient method of disposing of the whole case."

History demonstrates that this jurisdiction has had far more experience with the management of a bifurcated trial than has any federal court and has repeatedly addressed itself to the problems posed by bifurcation, not only in the terms of the state's and the public's interest, but, even more significantly, in terms of the protection of a defendant's interest.

The present bifurcated trial system set forth in sec. 971.175, Stats.,[4] grew out of this court's decision in *State ex rel. La Follette v. Raskin,* 34 Wis.2d 607, 150 N.W.2d 318 (1967). *Raskin,* and the problem posed therein, became significant after this court's adoption of the ALI rule of insanity in *State v. Shoffner,* 31 Wis.2d 412, 143 N.W.2d 458 (1966). Under the ALI test adopted in *Shoffner,* a defendant escapes criminal responsibility if he proves by the greater weight of the credible evidence that, by reason of mental disease or defect, he lacked the capacity to understand the wrongfulness of his conduct or to conform his conduct to the requirements of the rule. In *Raskin,* the court considered the implementation of the ALI rule; and in that case, it was specifically confronted with the problem of whether the statute which allowed trial courts to appoint disinterested psy-

---

[4] "**971.175 Sequential order of proof.** When a defendant couples a plea of not guilty with a plea of not guilty by reason of mental disease or defect, there shall be a separation of the issues with a sequential order of proof before the same jury in a continuous trial. The guilt issue shall be heard first and then the issue of the defendant's mental responsibility. The jury shall be informed of the 2 pleas and that a verdict will be taken upon the plea of not guilty before the introduction of evidence on the plea of not guilty by reason of mental disease or defect. This section does not apply to cases tried before the court without a jury."

chiatric experts to examine a defendant who entered a plea of not guilty by reason of mental disease or defect and to permit those psychiatric experts to testify and to be cross-examined in respect to their analyses of the defendant's statements and mental condition violated the defendant's privilege against self-incrimination. In an elaborate and well reasoned opinion, this court upheld the statutory bifurcation provision. It emphasized the value of the compulsory mental examinations of defendants who placed their mental capacity in issue. The court pointed out that this was an important part of the defendant's shield against being unjustly held criminally responsible; but it also recognized that a unitary trial would make such examinations less effective, because the defendant might be less candid and because complete candid disclosures of inculpatory facts would result in self-incrimination. The court protected the interest of society to do justice and protected the defendant's privilege against self-incrimination by requiring a sequential order of proof, thus insuring that inculpatory statements to the court-appointed examiners would not be admitted as evidence against the defendant while the jury was determining the issue of guilt.[5] *See, Raskin* at 622–23. The bifurcated trial, outlined in *Raskin,* was codified in sec. 971.175, Stats.

Following the implementation of the bifurcated trial system, the question arose whether psychiatric testimony was admissible to negate specific intent in the guilt phase of the trial. It should be noted that the type of testimony of a psychiatric nature prohibited in the guilt phase of the trial by Wisconsin decisions commencing with *Curl v. State,* 40 Wis.2d 474, 162 N.W.2d 77 (1968), was the

[5] Bifurcation provides an additional benefit in that it conforms with Wisconsin's practice of separating the guilt and disposition portions of criminal proceedings.

type of evidence associated with the causative doctrine that, because of mental disease or defect, the defendant, in the opinion of experts, was unable to intend, or lacked the capacity to intend, to commit a specific crime. It should be re-emphasized that this evidence is substantially congruent with evidence supportive of the ALI test for insanity to be utilized in the second phase of the bifurcated trial. Under the ALI test, a defendant is absolved of criminal responsibility if, by virtue of mental disease or defect, he lacked the capacity to understand the wrongfulness of his conduct or to conform his conduct to the requirements of the law. Under the causative doctrine, the evidence purports to show whether there is a doubt about the defendant's capacity to form the requisite level of intent to commit the crime. Both tests focus on exactly the same mental defect—lack of capacity. It is little wonder that this court, in a series of cases, pointed out that there was such an overlap of relevant testimony in respect to these two aspects of the mental state pertinent to criminal conduct that to permit the use of the causative doctrine in the guilt phase of the trial would vitiate the purpose of the bifurcated trial. Were optimum use made of the causative doctrine in the guilt phase of the trial, full and candid disclosure would be required and a defendant's right against self-incrimination could well be destroyed.

The pre-*Schimmel* exclusion rule was attributable, at least in part, to the fact that Wisconsin's ALI mental disease or defect standard of insanity is so very similar to the test for proving diminished capacity. While there is an almost imperceptible distinction between the type of evidence of mental abnormality relevant to the two tests, they involve greatly dissimilar burdens of proof[6]

---

[6] A defendant who pleads not guilty by reason of insanity must establish his mental disease or defect to a reasonable certainty by the greater weight of the credible evidence (sec. 971.15(3), Stats.); in the guilt phase of the trial, the defendant need only

and dispositional result. Where two persons commit the same criminal act, it is arbitrary to jail (on a lesser-included offense) or acquit the one who lacked the capacity to form a specific intent, while committing to a mental facility the one who lacked the capacity to understand the wrongfulness of his conduct. As one commentator observed, Wisconsin's pre-*Schimmel* exclusion of psychiatric evidence from the guilt phase of bifurcated trials was "a pragmatic recognition of the limits of jury tolerance for distinguishing angels on the heads of pins." Note, *Criminal Law—First Degree Murder—Evidence of Diminished Capacity Inadmissible to Show Lack of Intent,* 1976 Wis. L. Rev. 623, 639.

In *Curl,* this court rejected the notion that expert opinion evidence of mental or emotional problems not amounting to mental disease or defect was probative in the determination of the defendant's guilt.

The court also pointed out that exclusion of the evidence was necessary to preserve the integrity of the bifurcated trial system. The court stated:

". . . It may well be that all criminal behavior connotes some degree of personality disorganization. It may well be that, far short of actual psychosis, the personality with a paranoid flavoring may have less room to maneuver in forming intent or resisting impulses to engage in criminal or antisocial acts. . . . Judge and jury ought not be required to identify, classify and evaluate all categories and classifications of human behavior beyond the establishing of the fact of sanity. . . .
". . . In the law the dividing line as to accountability or nonaccountability due to mental condition is the test of sanity, whatever the legal definition of these terms may be or come to be. The same person is held accountable for his actions. The insane person is not. Personality disturbances or emotional disorders that fall short of insanity are not required areas of court inquiry and

raise a reasonable doubt about whether he possessed the requisite intent.

particularly not in that portion of a bifurcated trial on the issue of guilt." *Curl,* 40 Wis.2d at 485–86.

"To bifurcate a trial is to separate completely the issue of lack of accountability due to insanity from the issue of whether the crime was committed. If the testimony of earlier hospitalizations and mental condition at such earlier times is also material on the issue of guilt, there would be no reason to hold split trials. All testimony as to mental condition would be in the record before the trial on insanity began. This would split the issues, but not the testimony or areas of inquiry. At the least, it would require medical witnesses to appear twice at the same trial to give identical testimony. At the most, it would destroy the very reason for bifurcating the trial, to wit: separate consideration of separable issues." *Id.* at 484.

A few years later, the constitutional propriety and purpose of the sequential trial system was again examined in *State v. Hebard,* 50 Wis.2d 408, 184 N.W.2d 156 (1971). The court in that case analyzed at length the relationship between psychiatric evidence aimed at proving or negating the capacity to form a specific intent to commit a crime and the ALI test of insanity. This relationship was analyzed in light of the benefits and burdens of the bifurcated trial system. The court concluded that the benefits accruing to the defendant and society from the bifurcated trial system outweighed any burden placed on the defendant by the exclusionary rule. The court's analysis merits lengthy quotation:

"If the position of the defendant were upheld, more would be involved than a complete reversal of the reasoning of the *Curl Case.* The entire matter of permitting the bifurcating of trials would have to be re-examined." *Hebard,* 50 Wis.2d at 416–17.

"If all, or nearly all, of the testimony (predictably psychiatric evaluations of the mental condition of the defendant at the time of the crime) that is relevant on the issue of insanity, is also material on the element of intent, the basis and reason for affording an option to bifurcate the trial are gone. In fact, if testimony as to

mental condition relates to both issues, there would seem no sound reason left for a plea of not guilty by reason of insanity. Proof adequate to establish insanity would be at least adequate to raise a doubt as to intent and the long standing dispute as to who is to be held criminally responsible for wrongdoing would be replaced by disputes as to what degree of emotional or mental disorders would be sufficient to cast a doubt as to intent. What is involved is whether persons, sane by any test, are to be held unaccountable for their actions by reason of emotional problems or personality disorders with which they are perplexed. Where, as in Wisconsin, the statutes provide that a person found not guilty by reason of insanity is to be committed to a mental treatment facility until recovered and until his return to society presents no danger to the public, the introduction of evidence of mental condition on the question of impaired capacity to form intent during the guilt phase of the trial could well be required to acquit the defendant, sane or insane, without ever inquiring into the issue of sanity and without regard to the provisions of the statute requiring treatment of those pleading and establishing insanity." *Id.* at 418–19.

"For, as we see it a court finding of legal insanity is not a finding of inability to intend; it is rather a finding that under the applicable standard or test, the defendant is to be excused from criminal responsibility for his acts.

". . . What is necessarily implied [by the defendant's challenge] is the idea of a diminished responsibility for intentional acts, a partial insanity, what in the *Curl Case* we termed and rejected as the concept '. . . that the psychological problems or emotional disorders of a legally sane person may be a determinant of his intent, his intoxication or test of his guilt. . . .' In *Curl*, we expressly disavowed and rejected '. . . the suggestion that the personality dysfunction or dyscontrol, short of psychosis or insanity, is a relevant factor in the determination of guilt . . . .' In accepting the establishment of insanity as the measuring stick for accountability for one's action, this court declined the invitation to permit the sociopath or emotionally disturbed individual, legally sane by the applicable test, to escape being held accountable for criminal acts by pleading or establishing an impairment of the capacity to form intent, except on the

issue of insanity and in the insanity phase of the trial where the trial is bifurcated." *Id.* at 420–21.

"In reaching or repeating the conclusion that, in a bifurcated or two-stage trial, evidence as to mental condition is admissible only during the sanity phase, we balance the present procedure against what would replace it, viewed not only from the standpoint of sound public policy, but from the standpoint of the accused. Due process is the concept of fundamental fairness or fair play. To permit the testimony as to mental condition to be offered in the guilt phase of a two-stage trial, would not long result in the court or jury listening twice to the same witnesses repeating the same testimony, first on the issue of guilt, then again on the issue of sanity. Such redundancy could only be avoided by giving to defendants what the defendant here could have had if he had so elected: a single trial with testimony as to guilt and insanity simultaneously presented. A casualty of such removal of the existing option would be the opportunity for full and complete examination by court-appointed disinterested expert witnesses, often enough a balancing of scales where state resources or the securing of expert testimony are greater than those of a single defendant. Even if all statements and admissions of a defendant essential to a full psychiatric evaluation by psychiatrists, court-appointed or defense or state, were to be somehow admissible, the single trial can have drawbacks. For example, here it would have required the defendant to at the same time assert that he did not do the killings and that, if he did do them, he lacked capacity to intend or was insane. In being able, as he was here, to first deny the doing and then to claim nonaccountability for having done it, the defendant had the best of the possible worlds. What would be lost . . . by both defendants and the general public appears to us to far outweigh the benefit. Due process, fairness, or the public interest would not be served by taking from defendants the right to choose between the single trial and its two-stage alternative." *Id.* at 421–22.

The rationale of *Raskin, Curl,* and *Hebard* were relied upon in *Sprague v. State,* 52 Wis.2d 89, 187 N.W.2d 784 (1971), and *State v. Anderson,* 51 Wis.2d 557, 187

N.W.2d 335 (1971). These factors, which have been given demonstrable and extensive consideration by this court, were not dealt with at all by the United States Court of Appeals in *Hughes*. We do not fault it for not giving consideration to these factors, because, as it stated in its opinion, *Hughes* was not a bifurcated trial. The error was ours in extending the *Hughes* reasoning to the bifurcated trial without giving sufficient consideration to the reason for the rule excluding expert psychiatric evidence during the guilt phase of the trial.

The *Schimmel* court extended the *Hughes* rationale, which was expressly limited to the unitary trial concept, to bifurcated trials, without considering the tremendous impact that the new rule would have upon the bifurcated trial system. Moreover, we doubt the accuracy of the United States Court of Appeals' blanket characterization of psychiatric evidence on the causative element of intent as being both competent and relevant. *Curl,* at 485 and 486, pointed out that the rule excluding psychiatric evidence at the guilt phase of the trial was premised in part on the notion that such evidence is inherently suspect on both counts.

A recent commentator, after an extensive statistical analysis of the lack of agreement of psychiatrists in determining the state of mind necessary to have the capacity or incapacity to intend a crime, stated that there were numerous unanswered questions about:

". . . the lack of diagnostic agreement among psychiatrists, potential psychiatric bias, the difficulty of determining a past state of mind, and the disproportionate weight given to psychiatric testimony. Serious doubts about the ability of many psychiatrists to handle legal issues raise the possibility of uninformed and uninformative testimony being presented to a trier of fact which has come to place great reliance on the medical profession." Note, *Hughes v. Mathews,* 1979 Wis. L. Rev. 628, 659.

The *Hughes* court bootstrapped its conclusion that psychiatric opinion evidence of the intent was relevant and competent under the Wisconsin law of evidence, because some psychiatric evidence was recognized as admissible in respect to the ability to stand trial and the question of criminal responsibility. This, we think, is a nonsequitur. This type of rationale was expressly attacked in *Bethea v. United States* (Ct. App. D.C.), 365 A.2d 64, 86 n. 46:

"We do not quarrel with the notion that psychiatric testimony is of general relevance to the issue of responsibility . . . . Care must be exercised, however, to distinguish such general relevancy from the unwarranted additional assumption that the psychiatric sciences are capable of direct proof of the existence of the necessary mental state as defined by law."[7]

[7] Quoting from *United States v. Brawner*, 471 F.2d 969 (D.C. Cir. 1972), the *Hughes* court reasoned that it was irrational for Wisconsin to allow some defendants to raise intoxication as a defense negating capacity to form specific intent concomitant to denying other defendants the right to introduce psychiatric evidence to negate the capacity to form specific intent. 576 F.2d at 1257 n. 19. We do not find this reasoning persuasive. As noted in *Bethea v. United States*, 365 A.2d 64 (Ct. App. D.C. 1976), in regard to the *Brawner* court's analogy quoted in *Hughes*:

"The rule that evidence of intoxication may be employed to demonstrate the absence of specific intent figured prominently in the *Brawner* court's advocacy of consistency in the treatment of expert evidence of mental impairment. The asserted analogy is flawed, however, by the fact that there are significant evidentiary distinctions between psychiatric abnormality and the recognized incapacitating circumstances. Unlike the notion of partial or relative insanity, conditions such as intoxication, medication, epilepsy, infancy, or senility are, in varying degrees, susceptible to quantification or objective demonstration, and to lay understanding. As the Ninth Circuit observed in *Wahrlich v. Arizona*, 479 F.2d 1137, 1138 (9th Cir.), *cert. denied*, 414 U.S. 1011, 94 S. Ct. 375, 38 L. Ed.2d 249 (1973):

" 'Exposure to the effects of age and of intoxicants upon state of mind is a part of common human experience which fact finders

Moreover, there is substantial doubt in respect to the trustworthiness and reliability of psychiatric testimony. As stated by an eminent psychiatrist in the 1973 Washington University Law Quarterly:

"I predict the evidentiary value of psychiatric testimony will become less, rather than more, credible in the coming decades as further increase in knowledge adds to the confusion." Diamond, *From Durham to Brawner, A Futile Journey,* 1973 Wash. U. Law Q. 109, 115.

Similar critical comment was made by a distinguished professor of criminal law at the University of Wisconsin, Frank J. Remington, when he said:

"In general, it is not at all apparent that psychiatrists know any more than does the layman about whether the defendant had an intent to kill when the act causing death was committed." Memorandum of Frank J. Remington dated August 11, 1978, quoted by Frederick A. Fosdal, M.D., *Diminished Capacity, Intent and Psychiatric Testimony,* presented at the annual meeting of the Wisconsin Judicial Conference, Madison, Wisconsin, January 5, 1979, and published in Wisconsin Bar Bulletin, April 1979.

Doctor Fosdal's paper did not purport to deal with Professor Remington's challenge.

It is also significant that the only United States Supreme Court case—*Fisher v. United States,* 328 U.S. 463 (1946)—questioned the probativeness of psychiatric evidence which tended to cast doubt upon the defendant's intent and premeditation. While it is true, as the United States Court of Appeals pointed out in *Hughes,* the trial court in *Fisher* did not exclude the admission of such testimony, the trial court refused to give an instruction that the jury should consider evidence of the defendant's

can understand and apply; indeed, they would apply them even if the state did not tell them they could. The esoterics of psychiatry are not within the ordinary ken.' " *Bethea, supra* at 88.

mental deficiency not amounting to legal insanity to determine whether the defendant was guilty of murder in the first or second degree. The opinion of the United States Supreme Court reveals that it was not prepared to conclude that psychiatry had reached the point where psychiatry was reliable enough on the question of intent that such an instruction should be given. While the Supreme Court in *Fisher* conceptualized the problem as one of diminished "responsibility," rather than as, more appropriately, diminished "capacity," it is nevertheless apparent from the tenor of the majority opinion in *Fisher* that there was substantial doubt in respect to the probativeness of the testimony—a doubt sufficient at least to impel the Supreme Court to refrain from directing that the instruction should have been given.

Basically, the United States Court of Appeals in *Hughes* confused the purpose for which psychiatric testimony is relevant and competent, in some instances, with those in which its competency, relevancy, usefulness, and probativeness is highly suspect. The determination of capacity to form an intent—to find whether or not the alleged offender intended to do, in the sense of the criminal law, what he in fact did—requires a fine tuning of an entirely different nature than that required for the admission of evidence on the general question of insanity for the determination of whether or not there should be criminal responsibility.

Whether or not there should be criminal responsibility is essentially a moral issue. Is it just, in light of the ethics and standards of our society, to hold a person who is insane accountable for what has been done. To make that determination requires no fine tuning. It is, rather, a gross evaluation that a person's conduct and mental state is so beyond the limits of accepted norms that to hold him criminally responsible would be unjust. This is a far cry from accepting testimony which purports to

prove or disprove a specific intent, as distinguished from criminal responsibility. While some courts may have blind faith in all phases of psychiatry, this court does not. There is substantial doubt whether evidence such as was sought to be introduced here is scientifically sound, and there is substantial legal doubt that it is probative on the point for which it was asserted in this case. We commented in an earlier case that this court has frequently been dismayed by the examination of trial court records which showed a marked propensity of those who purport to have psychiatric expertise to tailor their testimony to the particular client whom they represent. *State ex rel. La Follette v. Raskin,* 34 Wis.2d at 622, quoting *Jessner v. State,* 202 Wis. 184, 187, 231 N.W. 634 (1930). Nor are we convinced that even careful cross-examination in this esoteric and largely unproved field is likely to reveal the truth. The problem is difficult enough when evaluating the gross standard of insanity in terms of criminal responsibility. It is intolerable when attempting to determine specific intent.

██ We conclude that, under the present state of the law, the proffered evidence is neither competent, relevant, nor probative for the purpose asserted in the instant case. Thus, in addition to the fact that the admission of the psychiatric evidence in the guilt phase of the bifurcated trial would put in jeopardy safeguards designed for the protection of the defendant, as well as of society, and in addition to the problems of the duplicative evidence in the various stages of the bifurcated trial which result in cumulative evidence and jury confusion, we conclude that the evidence itself is suspect and is properly excluded. The exclusion is proper in either a single phase trial or the guilt phase of a bifurcated trial.

It should be made clear, however, that we do not exclude from admission in the guilt phase of the trial or-

dinarily admissible evidence which tends to prove the state of mind of the defendant. Previous statements to the extent that they are admissible, excited utterances, previous conduct, and express declarations bearing on intent or lack of it—whether the alleged crime was accidental, inadvertent, or mistaken—are all admissible. What we bar from introduction at the guilt phase of the trial is expert opinion testimony tending to prove or disprove the defendant's capacity to form the requisite criminal intent.

Moreover, even if we were to conclude that such evidence was competent and relevant in the guilt phase of a bifurcated trial, as the United States Court of Appeals acknowledged in *Hughes*:

". . . the right of a defendant to present relevant and competent evidence is not absolute and may 'bow to accommodate other legitimate [state] interests in the criminal trial prcess' . . . ." (at 1258), *quoting with approval, Chambers v. Mississippi,* 410 U.S. 284 (1973).

For all of the reasons set forth herein and in the pre-*Schimmel* cases relied upon, we conclude that the trial court properly excluded the expert opinion testimony.

In summary, then, we conclude that this court is not compelled by *Hughes* to reach the broad conclusion that it did in *Schimmel. Hughes* did not address itself at all to the state justification for the exclusion of psychiatric testimony in the guilt phase of a bifurcated trial. Nor did *Schimmel* attempt to rationalize or reconcile Wisconsin's attitude toward the bifurcated trial in response to the United States Court of Appeals' clear invitation to exclude even competent and relevant testimony in the state's legitimate interest in the criminal trial process. We conclude that such justification has been amply demonstrated in the past cases and by the history of the bifurcated trial in Wisconsin; and, in addition, we have

substantial doubt about the competency, relevance, and probativeness of the particular testimony for the purpose of showing diminished capacity to form intent. Accordingly, we reaffirm our prior position that such testimony is inadmissible in the guilt phase of a bifurcated trial where the plea is not guilty and not guilty by reason of insanity.

Because we have determined that the rebuttable presumption used in this case was not constitutionally impermissible, because psychiatric opinion evidence in respect to the causative doctrine relating to specific intent was properly excluded, and because other evidence tending to rebut the presumption of specific intent was introduced without limitation, we conclude that the defendant was convicted under proper constitutional and evidentiary standards.

*By the Court.*—Judgment and order affirmed.

SHIRLEY S. ABRAHAMSON, J. *(dissenting)*. I do not think all expert opinion evidence on the issue of the accused's capacity to form the specific intent to commit the alleged crime should automatically be excluded in all criminal cases in this state (*i.e.*, bifurcated and "single stage" cases). I believe that the trial court should be permitted to determine on a case by case basis whether the evidence offered is relevant and competent.

Although in *Hughes v. Mathews*, 576 F.2d 1250 (7th Cir. 1978), the federal court of appeals pointed out that an evidentiary rule excluding relevant psychiatric opinion testimony on the issue of specific intent is itself constitutionally infirm because it deprives an accused in a criminal trial of the right under the sixth and fourteenth amendments to counter the state's accusations with relevant and competent testimony, I believe the majority opinion adopts such a rule for both "single stage" and bifurcated trials and is thus in direct conflict with the

*Hughes* case. The majority defends its rule, in part, by saying that a defendant's right to introduce even relevant expert opinion evidence bows to accommodate the state's interest in maintaining the bifurcated trial. I cannot accept this reasoning, because the majority appears to place more value on maintaining the bifurcated trial process than on the defendant's opportunity to defend himself effectively.

In the instant case the trial court gave the jury the instruction that "[t]he law presumes a person intends the natural and probable consequences of his own acts but the presumption may be rebutted." I think this instruction is unconstitutional. *Muller v. State,* 94 Wis.2d 450, 478–490, 289 N.W.2d 570 (1980) (Abrahamson, J. dissenting).

For these reasons, I would reverse the judgment and remand the cause for a new trial.