STATE of Wisconsin, Plaintiff-Respondent,

v.

Bonnie L. SMITH, Defendant-Appellant.†

Court of Appeals

*No. 83–147–CR. Submitted on briefs October 3, 1983.—
Decided December 27, 1983.*
(Also reported in 344 N.W.2d 711.)

† Petition to review denied.

400

For the defendant-appellant the cause was submitted on the briefs of *Ralph A. Kalal* and *Kalal & Habermehl* of Madison.

For the plaintiff-respondent the cause was submitted on the brief of *Bronson C. La Follette,* attorney general, *Michael L. Zaleski,* assistant attorney general, and *Steven D. Ebert,* assistant attorney general.

Before Gartzke, P.J., Dykman, J. and Gordon Myse, Reserve Judge.

DYKMAN, J.   Bonnie Smith appeals from a judgment of conviction and orders denying post-conviction motions following a trial for first-degree murder and armed robbery.[1]   He alleges the trial court erred by refusing to allow in-chambers voir dire of prospective jurors, by granting the state's motion to consolidate her case with her codefendant's, and by admitting certain portions of her codefendant's statement which im-

---

[1] Section 940.01, Stats., provides in part:

(1) Whoever causes the death of another human being with intent to kill that person is guilty of a Class A felony.

(2) In this chapter "intent to kill" means the mental purpose to take the life of another human being.

Section 943.32(1), Stats., provides in part:

Whoever, with intent to steal, takes property from the person or presence of the owner by either of the following means is guilty of a Class C felony:

(a) By using force against the person of the owner with intent thereby to overcome his physical resistance or physical power of resistance to the taking or carrying away of the property . . . .

plicated her. She also claims the bifurcated trial procedure shifted the burden of proof on the element of intent to her in violation of the due process clause of the fourteenth amendment to the United States Constitution.[2] We affirm.

Leona Milfred, aged 76, was stabbed to death in her rural Richland County grocery store shortly after 4:00 p.m. on February 10, 1982. Bonnie Smith and her co-defendant, James Willison, had been seen in the area that afternoon, and a car matching the description of defendant's was observed parked in front of the Germantown store between 4:00 and 4:15 p.m. Evening news reports of the crime included descriptions of the pair and their car and indicated an apparent robbery. On February 11, 1982, employees of the North Freedom branch of the Reedsburg Bank became suspicious when a man and a woman matching news descriptions of the murder suspects appeared at the bank with a jar of coins to exchange. An employee took down the license plate number of their car and reported it to police.

When police stopped Willison later that day, he acknowledged being in Germantown the day before and gave the officers a note written by defendant which implicated them in the crime. He was arrested and questioned. He admitted being at Mrs. Milfred's store with defendant the previous day and reported seeing blood on defendant's clothing when she left the store. Later, he stated he entered the store and saw defendant on top of Mrs. Milfred striking her with a knife. An autopsy revealed Mrs. Milfred died from loss of blood

---

[2] The fourteenth amendment to the United States Constitution provides in part:

No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; . . . .

caused by many knife wounds to the head and upper body.

Based on information given them by Willison, the police arrested defendant and charged her with first-degree murder and armed robbery. After her arrest, defendant stated to the police she had entered Mrs. Milfred's store to buy paper for her son, gotten into an argument with Mrs. Milfred, began striking her out of anger and then killed her to stop her from making noise and to keep her from calling police. She did not admit to robbing Mrs. Milfred.

Mrs. Milfred's murder and the subsequent arrest of defendant and Willison were reported in the news media throughout the state. Many reports featured earlier statements by Mrs. Milfred about previous robberies and her fear for her safety. In May 1982, defendant moved for a change of venue because of the extensive publicity. The trial court granted a change of venue to adjacent Iowa County.

On August 9, 1982, jury selection procedures began and defendant requested each prospective juror be questioned in chambers about his or her knowledge of the crime and the effects of pretrial publicity. Her request was denied. After a day-long voir dire during which seventy prospective jurors were questioned in the courtroom, defendant again moved for a change of venue on the grounds that an impartial jury could not be selected and that the voir dire questioning was insufficient to reveal prejudice resulting from pretrial publicity. The trial court denied this motion and a jury was sworn.

Neither defendant nor Willison testified at trial. During the first or guilt portion of the trial, however, both of their statements to police were admitted as evidence, and the officers taking the statements testified regarding their contents. Defendant objected to the

admission of portions of Willison's statement implicating her in a robbery scheme. The objection was overruled but the court instructed the jury that each co-defendant's admission was to be considered only in regard to the person making it. The jury was instructed on the elements of first-degree murder and armed robbery and, in relation to Willison, with being a party to those crimes. Both were convicted of the crimes charged.

Following her conviction, the issue of defendant's mental responsibility was tried in accordance with sec. 971.175, Stats.[3] The jury found her guilty a second time, rejecting a plea of not guilty by reason of mental disease or defect. Defendant moved for a new trial on the grounds that the trial court erred in not granting her motions for sequestered voir dire, in granting the state's motion to consolidate her case with Willison's, in admitting Willison's full statement which implicated her in a robbery scheme, and in requiring her to prove her lack of mental responsibility in the second portion of the trial. The trial court denied the motions.

## IN CHAMBERS VOIR DIRE

Defendant asserts she was unable to exercise her peremptory challenges intelligently because the trial

---

[3] Section 971.175, Stats., provides:

When a defendant couples a plea of not guilty with a plea of not guilty by reason of mental disease or defect, there shall be a separation of the issues with a sequential order of proof before the same jury in a continuous trial. The guilt issue shall be heard first and then the issue of the defendant's mental responsibility. The jury shall be informed of the 2 pleas and that a verdict will be taken upon the plea of not guilty before the introduction of evidence on the plea of not guilty by reason of mental disease or defect. This section does not apply to cases tried before the court without a jury.

court refused to permit private, individual examination of prospective jurors to detect hidden prejudices resulting from pretrial publicity. She urges us to follow *United States v. Blanton,* 700 F.2d 298 (6th Cir. 1983), and decide that failure to permit sequestered voir dire was an abuse of discretion.

An appellate court independently evaluates the voir dire procedure followed by a trial court to determine whether discretion was abused. *Irvin v. Dowd,* 366 U.S. 717, 723 (1961). Neither federal nor state law in Wisconsin require sequestered voir dire. *See United States v. Dellinger,* 472 F.2d 340, 376–77 (7th Cir. 1972), *cert. denied,* 410 U.S. 970 (1973) (individual questioning not the only method of conducting voir dire examination probing impact of pretrial publicity); *State v. Herrington,* 41 Wis. 2d 757, 765–66, 165 N.W.2d 120, 123–24 (1969) (sequestered voir dire not necessary to protect defendant's right to impartial jury). Instead, in *State v. Dean,* 67 Wis. 2d 513, 528, 227 N.W.2d 712, 719 (1975), *cert. denied,* 423 U.S. 1074 (1976), the Wisconsin Supreme Court identified four factors indicative of satisfactory voir dire procedures: (1) whether the trial court conducted a thorough initial questioning; (2) whether the jurors showed reluctance in candidly stating their biases in front of others; (3) whether restrictions were placed on defense counsel's questioning of the panel; and (4) whether adverse publicity reached the jury during trial. We conclude the *Dean* standards were met here.

The trial court gave extensive background statements acknowledging the substantial pretrial publicity, stating he presumed everyone had heard of the case, stating the presumption of defendant's innocence, and stressing the importance of providing her with an impartial

jury. The court questioned individually all prospective jurors who indicated they had formed opinions on defendant's guilt. Topics covered in the court's voir dire questioning included whether anyone knew the victim, defendant, her codefendant, any of the forty-eight potential witnesses, law enforcement officials or members of their families, or counsel; whether the jurors believed the defendant might be guilty because she was arrested; whether the jurors believed in the concept of presumption of innocence; and whether anyone had formed an opinion based on pretrial publicity.[4]

---

[4] The following is an example of the trial court's voir dire examination on the issue of pretrial publicity:

This case has been the subject, as all of you know, I'm sure, of immense coverage by television, radio and newspaper, not so much recently as what occurred in February and March of this year.

Is there anybody who has not heard anything about it or read anything about it? Okay. All of you have, know something about the matter through the media and that, of course, is natural and the fact that you may have read or heard or seen something about the case does not disqualify you from acting on the jury. Let me emphasize the fact that the two defendants, Mr. Willison and Miss Smith, have been charged with the commission of two criminal acts. They have not been convicted, and they come into this courtroom presumed to be innocent, and that presumption stays with them throughout the entire course of this trial unless overcome by evidence which satisfies the jury of their guilt beyond a reasonable doubt.

They are not required to prove that they are innocent. They are not required to testify if they choose not to do so.

Now, is there any member of the jury panel who, because of what you have read, heard or seen, feels that you would be unable to sit as an unbiased member of the jury panel and listen to the evidence presented in the courtroom and any instructions that I would give the jury and based solely on the evidence that you hear in this courtroom and the instructions, reach a fair and impartial verdict? Anybody who because of what you have read, seen or heard, has already made your mind up and your mind is closed and you would be unable to sit and

Eleven prospective jurors stated they had formed opinions about defendant's guilt. Those eleven were subject to individual questioning by prosecution and defense counsel as well as by the court.[5] That eleven were will-

listen to the evidence and reach your decision not on what you have read, heard or seen, but reach your decision solely on the evidence presented in this courtroom.

Is there anybody who feels that they could not do that? What we are looking for, members of the jury, are fourteen people who will listen to the evidence and the instructions and reach a fair and impartial verdict, fair to the State of Wisconsin and fair to both defendants. That is the type of people that we must have on this jury, and my question again is to you, is there anyone because of what you have read, seen or heard, would be unable to do that? Mr. Anderson? I don't want your opinion, Mr. Anderson, I just want to know that recognizing that people who are charged with crimes are presumed to be innocent and that it is necessary under our system of government for the State to prove their guilt beyond a reasonable doubt, recognizing that fact, do you feel, Mr. Anderson, that because of what you have read, seen or heard, that you would be unable to base your decision on what you hear in this courtroom?

[5] Defense counsel examined a prospective juror on the issue of pretrial publicity as follows:

MR. STOLTZ: Maybe I misunderstood you when the Judge was questioning you. Without saying which way or the other, did you say you already made up your mind as a result of . . .

MRS. NONDORF: No, I hadn't.

MR. STOLTZ: . . . conversations?

MRS. NONDORF: I mean I had formed my opinion, but this is from the newspapers, television and reading, you know, talking to other people.

MR. STOLTZ: You formed your opinion then as to the guilt or innocence of these defendants, right?

MRS. NONDORF: Well, right, I would say yes I have. But I mean, he had an addition on to that. I mean after listening to the trial, you know.

THE COURT: Mrs. Nondorf, as I understand it, you have an opinion at the present time.

MRS. NONDORF: No, not . . . I mean I had.

ing to expose themselves to repeated questioning in the presence of the panel reflected little reluctance to speak candidly.

THE COURT: You had . . .

MRS. NONDORF: But we will have . . . you said go through the trial and that then . . .

THE COURT: That's correct. The test is whether you could set aside whatever opinion you had and base your opinion solely on the evidence you hear in the courtroom.

MRS. NONDORF: Yes. I said yes.

MR. STOLTZ: I want to make sure I understand it because you based your opinion on what you have read in the paper or talked to other people about or heard on T.V., is that correct?

MRS. NONDORF: That's correct.

MR. STOLTZ: Well, does that put you in a position that the defendants are going to have to come into this courtroom and disprove that to change your mind?

MRS. NONDORF: No, I don't think so. No.

MR. STOLTZ: You know that they are not required to prove their innocence?

MRS. NONDORF: No, un-huh.

MR. STOLTZ: And you have not heard their side of the story if they are going to present evidence. All you have heard is what is in the newspapers?

MRS. NONDORF: Uh-huh.

MR. STOLTZ: Right?

MRS. NONDORF: That's right.

MR. STOLTZ: And there has (sic) been no statements . . . press statements from Mr. Willison . . . in the newspapers saying that they didn't do it?

MRS. NONDORF: Uh-huh.

MR. STOLTZ: Has there? Have you ever read any of those?

MRS. NONDORF: No, nothing.

MR. STOLTZ: So you have based your opinion solely on what all of the media coverage was?

MRS. NONDORF: That's right, absolutely, yes.

MR. STOLTZ: Do you think that has prejudiced you?

MRS. NONDORF: Well, at one time I think it had.

MR. STOLTZ: Well, if you have made up your mind, it is prejudiced against these people, isn't it?

THE COURT: Not necessarily, that is not a fair . . .

MRS. NONDORF: No, not really.

Defendant's questioning of prospective jurors was limited only by requirements that it be before the panel and that no questions as to the source and nature of the publicity received be asked. The ultimate question—whether the juror could disregard the publicity, *Irvin*, 366 U.S. at 723—was asked by the court. Defendant was allowed to challenge a juror's answer, subject only to the risk of offending the prospective juror. The jury was sequestered during the trial. The voir dire procedure followed meets Wisconsin standards for impanelling an impartial jury.

*United States v. Blanton, supra,* does not govern this case. *Blanton* involved the trial of a former Tennessee governor who was prosecuted for selling state liquor licenses while in office. Not only are Wisconsin and federal law well developed on voir dire procedures, but the facts of *Blanton* are substantially different. The *Blanton* case was one of several which dealt with the ex-governor's misconduct and which received local, regional and national publicity over a prolonged period of time. Under those facts, it may have been appropriate to conduct a sequestered voir dire. It was not necessary here.

THE COURT: . . . accusation. Mrs. Nondorf, let's just [put] this matter at rest. You have told us that you are able to put those preconceived ideas aside and sit as a member of the jury and listen to the evidence and make up your mind.

MRS. NONDORF: Yes, that's absolutely . . .

THE COURT: That is all we want.

MR. STOLTZ: If you are willing to do that, thank you, but I want to make sure all of these things that you have read about, that you are just going to put that out of your mind.

MRS. NONDORF: Well, yes.

MR. STOLTZ: Can you do that?

MRS. NONDORF: Yes, I can, uh-huh.

MR. STOLTZ: Okay. No matter how damaging they might be?

MRS. NONDORF: Yes.

## CONFRONTATION

Defendant alleges the trial court violated her right, under the sixth amendment to the United States Constitution, to confront a witness testifying against her. Willison gave law enforcement officers a lengthy statement confessing his own participation in the robbery plans and implicating defendant in both the robbery and the murder. Defendant confessed to having killed Leona Milfred but refused to answer questions about a robbery attempt. Since neither Willison nor defendant testified at trial, she was unable to cross-examine him about his statement regarding her participation in a robbery scheme.

Defendant claims her confrontation right would have been protected had the trial court severed her and Willison's trials or had it refused to admit that portion of Willison's confession implicating her in the robbery scheme. Her position is that the court erred in consolidating the two cases because it knew the prosecution would use Willison's statement to implicate her in the robbery when her own statement did not. Given the facts of this case, we disagree that either severance or exclusion of Willison's statement was necessary.

Section 971.12(3), Stats.,[6] provides that a trial court shall grant a severance if the prosecution intends to use the statement of a codefendant which implicates

---

[6] Section 971.12(3), Stats., provides:

If it appears that a defendant or the state is prejudiced by a joinder of crimes or of defendants in a complaint, information or indictment or by such joinder for trial together, the court may order separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires. The district attorney shall advise the court prior to trial if he [or she] intends to use the statement of a codefendant which implicates another defendant in the crime charged. Thereupon, the judge shall grant a severance as to any such defendant.

another defendant in the crime charged. This statute is a codification of *Bruton v. United States,* 391 U.S. 123 (1968), which held that use of a nontestifying codefendant's extrajudicial statements in determining a defendant's guilt violates the right of cross-examination provided by the confrontation clause of the sixth amendment to the United States Constitution.[7] However, sec. 971.12(3) has been construed not to require severance in all instances in which a codefendant's implicating statement will be used. *Cranmore v. State,* 85 Wis. 2d 722, 747, 271 N.W.2d 402, 415 (Ct. App. 1978).

When proper limiting instructions are given and codefendants all make interlocking statements, admission of a nontestifying defendant's confession conforms to sixth amendment requirements. *Parker v. Randolph,* 442 U.S. 62 (1979) (plurality decision). The *Bruton* rationale was that the prejudicial impact on the incriminated defendant of a codefendant's confession was too great to be cured by a limiting instruction. The majority in *Parker* concluded that that rationale was inapplicable where the defendant's own confession was properly introduced at trial.

However, as Justice Blackmun noted in his concurrence in *Parker,* the majority's decision shifts the focus from the error of admitting a codefendant's confession to a determination of the extent to which the confessions interlock. *Parker,* 442 U.S. at 79 (Blackmun, J., concurring). Two confessions may interlock in part only, and, though they may be internally consistent, one may go beyond the other in implicating the con-

---

[7] The sixth amendment to the United States Constitution provides in part:

In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him; . . . .

fessor's codefendant, with a prejudicial effect. *Id.* Justice Blackmun concluded the focus should be on whether the error of improperly admitting a codefendant's confession was harmless rather than on whether the confessions were sufficiently interlocking to protect the defendant's confrontation right. *Id.* In light of *Parker,* our approach is to first determine whether the codefendant's statements are interlocking; if they are, then the statements are *per se* admissible. If they are not, the court must determine whether the error of admitting them was harmless beyond a reasonable doubt. *Schneble v. Florida,* 405 U.S. 427, 430 (1972).

The trial court concluded that defendant's and Willison's statements were interlocking. We review the inculpatory statements *de novo* to determine whether they were substantially similar on critical points. *United States v. Fleming,* 594 F.2d 598, 604 (7th Cir.), *cert. denied,* 442 U.S. 931 (1979). Both Willison and defendant orally confessed to law enforcement officials; one of Willison's statements was tape recorded and played at trial without excision of remarks inculpating defendant. Defendant admitted having entered Mrs. Milfred's store with a knife in her pocket, getting into an argument with Mrs. Milfred and killing her. She did not answer questions related to robbery and did not volunteer information implicating herself in a robbery. She stated she entered the store to buy paper for her son.

Willison's statement described defendant's involvement in planning and committing an armed robbery. He stated that defendant began talking about robbing "some place" early in the morning of February 10 and that she frequently compared the two of them to Bonnie

and Clyde. He said when defendant got into the car after killing Mrs. Milfred, she placed some items into the glove compartment and locked it. The trial court instructed the jury that Willison's statement should be considered only in the case against him.

In *Fleming,* the court found the statements of two codefendants to be interlocking where descriptive details differed but the same crimes were described by both. 594 F.2d at 604. However, a third defendant's statement did not interlock because it did not implicate him in any crime. *Id.* at 605. Here, defendant's statement did not implicate her in a robbery and, to that extent, it does not interlock with Willison's. We conclude, however, that admission of that portion of Willison's statement was harmless error.

Harmless error occurs when it is clear beyond a reasonable doubt that the properly admitted evidence of guilt is so overwhelming that the prejudicial effect of a codefendant's admission is insignificant by comparison. *Parker,* 442 U.S. at 70–71. Defendant's mother, Martha Putz, testified that defendant had been at her house the morning of the murder and the two had discussed defendant's financial situation. Mrs. Putz said she loaned defendant $100 to pay some bills. Later that morning, defendant and Willison called Mrs. Putz to ask her for a gun which they told her they wanted to sell. Around noon on February 10, defendant returned to Mrs. Putz's house with Willison to ask again for a gun which Mrs. Putz refused to give them. Defendant confessed to having entered the store armed with a knife.

Charlie Moon, who delivered gas and oil to the Milfred store, testified he saw Mrs. Milfred alive at 4:08 p.m.

Seven minutes later, at 4:15 p.m., Francis Owen found Mrs. Milfred's dead body.

Witnesses stated that Mrs. Milfred's cash drawer, which usually was closed, was found open with a "no sale" rung up and contained only pennies. Other change was strewn on the floor. Mrs. Milfred's son Terry testified that the register always contained cash but that no bills were found in the store. He also reported that eleven to thirteen containers of coins, totalling between $450 and $500, were found. The containers included dusty jars with slotted lids, filled with a mixture of half-dollars, quarters, dimes, nickels, and pennies. The assistant cashier at the North Freedom Bank stated that defendant exchanged $54.31 worth of mixed coins in a dusty pickle jar with a slotted lid for bills on the day following the murder. Without Willison's statement, the evidence that defendant robbed Milfred's store is overwhelming.

Defendant argues the error was not harmless as to her insanity defense in the second part of her bifurcated trial because Willison's statement implies she was capable of logically planning the robbery. Her own confession to law enforcement officials and statements narrated through psychiatrist Leigh Roberts demonstrate the logic of her conduct. The psychiatrist testified that defendant told him she attacked Mrs. Milfred in part because she was afraid the police would be called. Such reasoning reflected logical thought. None of the expert witnesses called to testify regarding defendant's mental condition stated she met insanity defense requirements. If it was error to admit Willison's statement because of prejudice to defendant's insanity defense, the error was harmless.

## BIFURCATED TRIAL

Defendant contends she was required to disprove intent, an element of first-degree murder, when asserting her insanity defense in the second part of the bifurcated trial. She argues that because she was not allowed during the guilt phase of the trial to present evidence showing her inability to form intent and because under sec. 971.15(3), Stats.,[8] she has the burden of proving insanity, the burden of proving lack of intent is shifted to her. Defendant's argument is without merit.

The state is required to prove beyond a reasonable doubt every fact needed to constitute the crime charged. *Patterson v. New York,* 432 U.S. 197, 206 (1977). After the crime is proven, the defendant may present an affirmative defense which, if established, requires the court to substitute psychiatric treatment for a penal sentence. Secs. 971.15(3) and 971.17(1), Stats. The affirmative defense does not affect the facts which the state proved in obtaining the conviction. It constitutes a separate issue upon which the defendant is required to carry the burden of proof. *Patterson* at 206–07.

Wisconsin has adopted a bifurcated trial system which separates completely the issue of lack of accountability due to insanity from the issue of whether a crime was committed. *Steele v. State,* 97 Wis. 2d 72, 90, 294 N.W.2d 2, 10 (1980). A finding of legal insanity is not a finding

---

[8] Section 971.15(3), Stats., provides:

Mental disease or defect excluding responsibility is an affirmative defense which the defendant must establish to a reasonable certainty by the greater weight of the credible evidence.

of inability to intend; it is a finding that a defendant is to be excused from criminal responsibility for his or her acts. *Id.* at 91, 294 N.W.2d at 10. The very reason for using a bifurcated trial is to consider separate issues separately. *Id.* at 90, 294 N.W.2d at 10.

Here, the state introduced evidence to support a finding of intent during the first trial. The trial court instructed the jury on the elements of first-degree murder, including intent. The guilty verdict indicates intent was proven beyond a reasonable doubt. The separate issue of insanity, required to be proven by defendant, was the single focus of the second trial and was at issue only after intent was found to be present.

*By the Court.*—Judgment and orders affirmed.