STATE, Respondent, v. HEBARD, Appellant.*

*No. State 71. Argued January 7, 1971.—Decided March 5, 1971.*
(Also reported in 184 N. W. 2d 156.)

* Motion for rehearing denied, without costs, on May 4, 1971.

410

For the appellant there was a brief by *Alexander R. Grant* and *Cohen, Grant, Crooks, Parins & Liebmann,* and oral argument by *Vivi L. Dilweg,* all of Green Bay.

For the respondent the cause was argued by *Betty R. Brown,* assistant attorney general, with whom on the brief was *Robert W. Warren,* attorney general.

ROBERT W. HANSEN, J.  What is challenged here is the separation of a criminal trial into two phases, the first as to guilt, the second as to insanity, with evidence as to the mental condition of the defendant admitted only

on the issue of insanity. Such sequential consideration of issues and evidence is claimed to be constitutionally infirm, as applied to the defendant here and on its face.

*The Wisconsin experience.*

Where a defendant in a criminal case pleads not guilty and not guilty by reason of insanity, the separate consideration of issues raised as to guilt and as to insanity is not a recent development in Wisconsin courts, although originally the determination as to insanity appears to have preceded the consideration of guilt.[1] Reversal of the sequence was indicated, more likely required, by the legislative enactment that a defendant was to be presumed sane at the time of the act,[2] the law further providing that if evidence is produced which rebuts the presumption, the state has the burden of proving beyond a reasonable doubt that the defendant was sane at the time of the act.[3] At the time of the instant crime, this statute controlled as did the *"Esser* test" of insanity.[4] Subsequently, in *State v. Shoffner,*[5] this test was reviewed, and a defendant was given an election either to be tried under the *Esser* test as to insanity or to be tried under the insanity test of sec. 4.01 of the Model Penal Code of the American Law Institute, known as the ALI test.[6] If electing to be tried under the ALI test, the

[1] *See* secs. 4697, 4698, 4699, ch. 191, R. S. 1878.

[2] Sec. 957.11 (2), Stats. 1967.

[3] *Id.*

[4] " 'The term "insanity" in the law means such an abnormal condition of the mind, from any cause, as to render the defendant incapable of understanding the nature and quality of the alleged wrongful act, or incapable of distinguishing between right and wrong with respect to such act.' " *State v. Esser* (1962), 16 Wis. 2d 567, 599, 115 N. W. 2d 505.

[5] (1966), 31 Wis. 2d 412, 143 N. W. 2d 458.

[6] "A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality

defendant is required to waive the statutory burden of proof placed upon the state and assume the burden of convincing the jury of his insanity to a reasonable certainty by the greater weight of the evidence.[7]

In this state, the right of a defendant to ask for a two-stage trial derives, at least in part, from the enactment of a statute that permits a trial court to appoint not more than three disinterested, qualified experts to examine the defendant and to testify as to their analysis of the defendant's mental condition.[8] Earlier, this court has noted, with evident dissatisfaction, a "striking tendency" of experts testifying for prosecution or defense "to accommodate their opinions to the necessities of that side of the case upon which they were testifying, . . ."[9] When the court-appointed experts' statute was attacked as not recognizing the constitutional privilege against self-incrimination, it was upheld in *State ex rel. La Fol-*

[wrongfulness] of his conduct or to conform his conduct to the requirements of law. American Law Institute, *Model Penal Code*, sec. 4.01 (1), page 66 of Proposed Official Draft (1962).

[7] *State v. Shoffner, supra*, at page 427, providing: "We see no good reason why a particular defendant may not waive the benefit of the rule which imposes the burden of proof upon the state beyond a reasonable doubt. Accordingly, we direct that where a defendant pleads not guilty by reason of insanity, presents evidence that as a result of mental disease or defect (other than an abnormality manifested only by repeated criminal or otherwise antisocial conduct) he lacks substantial capacity to conform his conduct to the requirements of law, desires to be tried under the American Law Institute definition of the defense of insanity, and is willing to carry the burden of proof on the issue, he is to be permitted to waive such provisions of sec. 957.11 (1) and (2), Stats., as place the burden of proof on the insanity issue on the state, and have the jury instructed in terms of the American Law Institute definition. This option is to be available to Shoffner upon retrial, as well as to defendants in other cases not yet tried."

[8] Sec. 957.27, Stats. 1967.

[9] *Jessner v. State* (1930), 202 Wis. 184, 187, 231 N. W. 634, 71 A. L. R. 1005.

*lette v. Raskin* [10] as authorizing efficient and complete mental examinations, but the defendant was assured a right to ask for a sequential order of proof on the separate issues of guilt and insanity. The *Raskin Case* protected a defendant, during the guilt phase of the trial, against use of any statements made by him to a court-appointed expert witness, specifically holding, ". . . such compulsory statements and confessions can only be used on the issue of insanity and not in any way upon the issue of guilt." [11]

The broader question of whether evidence as to mental condition was admissible during the guilt phase of a two-stage trial came before this court in *Curl v. State.* [12] There the defendant contended it was error for a trial court during the guilt phase to refuse to admit evidence that the defendant had been earlier under treatment at mental hospitals in two western states. This court upheld the exclusion of evidence bearing upon mental condition during the guilt phase, concluding:

". . . Personality disturbances or emotional disorders that fall short of insanity are not required areas of court inquiry and particularly not in that portion of a bifurcated trial on the issue of guilt." [13]

*As applied to defendant.*

If the position of the defendant were upheld, more would be involved than a complete reversal of the reasoning of the *Curl Case.* The entire matter of permitting

---

[10] (1967), 34 Wis. 2d 607, 619, 150 N. W. 2d 318.

"We think this section should be construed to require a mental examination which is efficient and complete and not limited by constitutional restrictions or dependent upon the waiver of the accused's constitutional right not to give incriminating answers during the examination. . . ."

[11] *Id.* at page 627.

[12] (1968), 40 Wis. 2d 474, 162 N. W. 2d 77, certiorari denied, 394 U. S. 1004, 89 Sup. Ct. 1601, 22 L. Ed. 2d 781.

[13] *Id.* at page 486.

the bifurcating of trials would have to be re-examined.[14] If that were to be done, or somehow required to be done, this is not the case in which it would be attempted. For here the issue raised as to the admissibility of psychiatric testimony as to mental condition during the guilt phase on the matter of intent has no applicability to the trial held. On the issue of guilt, the defendant here asserted that he did not do the killing. That was his sole defense. No evidence was offered by the defense as to his intent or lack of capacity to form intent. To do so would hardly have been consistent with the defendant's position that he was not the person who pulled the trigger and killed the five persons. Postconviction counsel now asserts that the trial court should have instructed the jury to consider the defendant's mental condition as it might relate to capacity to form intent. In addition to other sound reasons for not so doing, no evidence had been introduced during the guilt phase of the trial, and no instruction on the issue of guilt was requested. To have done so, even if not otherwise improper, would not have aided the defendant's effort to raise a reasonable doubt that he had done the shooting. As often enough occurs, postconviction counsel is substituting a theory of trial defense not only different, but entirely inconsistent with the defense trial position upon which defendant and his trial counsel elected to rely.

*Insanity and intent.*

The concept, as it has developed in Wisconsin, that a defendant, entering a plea of not guilty by reason of

[14] *Id.* at page 484. ". . . All testimony as to mental condition would be in the record before the trial on insanity began. This would split the issues, but not the testimony or areas of inquiry. At the least, it would require medical witnesses to appear twice at the same trial to give identical testimony. At the most, it would destroy the very reason for bifurcating the trial, to wit: separate consideration of separable issues."

insanity, may request a two-stage trial but must expect testimony as to his mental condition to be admissible only on the issue of insanity, rests upon the separability of guilt and insanity as issues in the single trial. Intent or the intentional nature of the act committed is an essential element of the majority of criminal offenses. The state, on the issue of guilt, is required to establish beyond reasonable doubt all essential elements of the crime charged, intent included. If all, or nearly all, of the testimony (predictably psychiatric evaluations of the mental condition of the defendant at the time of the crime) that is relevant on the issue of insanity, is also material on the element of intent, the basis and reason for affording an option to bifurcate the trial are gone. In fact, if testimony as to mental condition relates to both issues, there would seem no sound reason left for a plea of not guilty by reason of insanity. Proof adequate to establish insanity would be at least adequate to raise a doubt as to intent and the long standing dispute as to who is to be held criminally responsible for wrongdoing would be replaced by disputes as to what degree of emotional or mental disorders would be sufficient to cast a doubt as to intent. What is involved is whether persons, sane by any test, are to be held unaccountable for their actions by reason of emotional problems or personality disorders with which they are perplexed. Where, as in Wisconsin, the statutes provide that a person found not guilty by reason of insanity is to be committed to a mental treatment facility until recovered and until his return to society presents no danger to the public,[15] the introduction of evidence of mental condition on the question of impaired capacity to form intent during the guilt phase of the trial could well be required to acquit the defendant, sane or insane, without ever inquiring into the issue of sanity and without regard to the pro-

[15] Sec. 971.17, Stats.

visions of the statute requiring treatment of those pleading and establishing insanity.

Defendant's theory was recently adopted by the Arizona Supreme Court in *State v. Shaw* [16] now on appeal to the United States Supreme Court. The Arizona statute provided for two separate trials, rather than a two-stage single trial, and went beyond giving the defendant a right to seek sequential presentation of proof on separable issues.[17] In such case involving the crime of robbery, the Arizona court found unconstitutional the required-by-statute two-trial procedure. What it necessarily implied speaks as loudly as what it expressly said. What it said, without authority from medical sources and without qualification, is that: ". . . If an individual is insane he would not be able to intend an act, nor would he be able to premeditate or have malice aforethought. . . ." [18] Applied to the case now before us, this would have us state as a matter of law that the defend-

[16] (1970), 106 Ariz. 103, 471 Pac. 2d 715, 721, the court stating:
"The bifurcated trial would require the jury to find the intent or the intention solely from the circumstances connected with the offense, . . . and the question of sound mind would have to be presented at the second trial, . . ." and "To follow such procedure would mean that the court could not consider the evidence of insanity at the first trial. This is the only reasonable interpretation; otherwise, the procedure in the second trial would be duplication and redundant. . . ."

[17] Sec. 13—1621.01, Ariz. Stats. **"Two trials where defense of not guilty by reason of insanity asserted.**

"A. In any case where the defense of not guilty by reason of insanity is asserted, two trials shall be set unless good cause for a single trial is shown.

"B. The first trial shall determine the issue of guilt or innocence . . .

"C. If the defendant is found guilty at the first trial, there shall be a second trial following promptly after the first trial. At the second trial, the jury shall consider the defense of insanity . . . ."
*State v. Shaw, supra,* at page 720.

[18] *State v. Shaw, supra,* at page 721.

ant, if found insane (under the ALI test which he chose to have govern), did not and could not intend to kill the five persons he did kill. He aimed the gun at least five times, each time at the head of one of the five. He pulled the trigger at least five times. He did not miss. The bullets hit their mark and five persons lay dead. The Arizona conclusion is that their deaths cannot be found to have been intentionally caused. We do not share the conclusion, much less its certainty. For, as we see it, a court finding of legal insanity is not a finding of inability to intend; it is rather a finding that under the applicable standard or test, the defendant is to be excused from criminal responsibility for his acts.[19]

However, what is accomplished by the Arizona result, if it were to become the law of the land, goes beyond the dispute as to whether a person found legally insane can perform an intentional act. What is necessarily implied is the idea of a diminished responsibility for intentional acts, a partial insanity, what in the *Curl Case* we termed and rejected as the concept ". . . that the psychological problems or emotional disorders of a legally sane person may be a determinant of his intent, his intoxication or test of his guilt. . . ."[20] In *Curl*, we expressly disavowed and rejected ". . . the suggestion that the personality dysfunction or dyscontrol, short of psychosis or insanity, is a relevant factor in the determination of guilt . . . ."[21] In accepting the establishment of insanity as the measuring stick for accountability for one's action, this court declined the invitation to permit

[19] See *State v. Kanzelberger* (1965), 28 Wis. 2d 652, 664, 137 N. W. 2d 419, this court quoting *Brook v. State* (1963), 21 Wis. 2d 32, 47, 123 N. W. 2d 535: " 'Essentially the insanity defense presents a moral issue to juries in criminal cases as to whether a particular defendant should be held criminally accountable for the offense with which he is charged . . . .' "

[20] *Curl v. State, supra,* at page 485. *See also: Mental or Emotional Condition as Diminishing Responsibility for Crime,* 22 A. L. R. 3d 1228.

[21] *Curl v. State, supra,* at page 485.

the sociopath or emotionally disturbed individual, legally sane by the applicable test, to escape being held accountable for criminal acts by pleading or establishing an impairment of the capacity to form intent, except on the issue of insanity and in the insanity phase of the trial where the trial is bifurcated. In thus limiting claims of having personality or emotional disorders, as well as to being insane, to the insanity phase of a two-stage trial, the court said, and does not now change, that:

". . . It may well be that all criminal behavior connotes some degree of personality disorganization. It may well be that, far short of actual psychosis, the personality with a paranoid flavoring may have less room to maneuver in forming intent or resisting impulses to engage in criminal or antisocial acts. . . . Judge and jury ought not be required to identify, classify and evaluate all categories and classifications of human behavior beyond the establishing the fact of sanity. . . . In the law the dividing line as to accountability or nonaccountability due to mental condition is the test of sanity, . . ." [22]

In reaching or repeating the conclusion that, in a bifurcated or two-stage trial, evidence as to mental condition is admissible only during the sanity phase, we balance the present procedure against what would replace it, viewed not only from the standpoint of sound public policy, but from the standpoint of the accused. Due process is the concept of fundamental fairness or fair play. To permit the testimony as to mental condition to be offered in the guilt phase of a two-stage trial, would not long result in the court or jury listening twice to the same witnesses repeating the same testimony, first on the issue of guilt, then again on the issue of sanity. Such redundancy could only be avoided by giving to defendants what the defendant here could have had if he had so elected: a single trial with testimony as to

[22] *Id.* at pages 485, 486.

guilt and insanity simultaneously presented. A casualty of such removal of the existing option would be the opportunity for full and complete examination by court-appointed disinterested expert witnesses, often enough a balancing of scales where state resources or the securing of expert testimony are greater than those of a single defendant. Even if all statements and admissions of a defendant essential to a full psychiatric evaluation by psychiatrists, court-appointed or defense or state, were to be somehow admissible, the single trial can have drawbacks. For example, here it would have required the defendant to at the same time assert that he did not do the killings and that, if he did do them, he lacked capacity to intend or was insane. In being able, as he was here, to first deny the doing and then to claim non-accountability for having done it, the defendant had the best of the possible worlds. What would be lost under the Arizona approach by both defendants and the general public appears to us to far outweigh the benefit. Due process, fairness, or the public interest would not be served by taking from defendants the right to choose between the single trial and its two-stage alternative.

*Shift of burden of proof.*

What has been said about the distinction between the intentional commission of an act and the nonaccountability for such act by reason of insanity relates as well to defendant's contention that the shift of burden of proof, when the ALI test of insanity is accepted by a defendant, is constitutionally infirm. Once again, it is a matter of option. The defendant elected, not only the bifurcation of the single trial, but the test of sanity by which he is to be judged. If he opts for the lower standard of accountability of the ALI test, the burden of proof as to essential elements of the crime does not shift. It is only as to the affirmative defense of insanity, a defense of confession and avoidance, that he assumes

the burden of establishing such defense to a reasonable certainty by the greater weight of the credible evidence. That the decision as to where the burden is to be placed is a matter of state public policy, not reaching constitutional dimensions, is made clear by the decision of the United States Supreme Court in *Leland v. Oregon*.[23] In that case, Oregon, the only state so to do, required a defendant pleading insanity as a defense to prove such insanity beyond a reasonable doubt. The United States Supreme Court upheld the Oregon law, finding no violation cf due process.[24] Defendant urges that this court reject such majority decision and follow instead the dissenting opinion of Mr. Justice FELIX FRANKFURTER who, though approving of some shifts of burden,[25] found the Oregon procedure to be a violation of due process. In any event, this court does not have the option of selecting between majority and minority opinions of the nation's highest tribunal. Until and unless the highest court itself finds greater wisdom in the *Leland* dissent, we are not privileged to do so. The majority opinion establishes that placing the burden of the affirmative defense of insanity upon the defendant is not a violation of due process, and that, even when a choice to elect between tests and procedures was not present, as in the instant case, due process would not be violated.

[23] (1952), 343 U. S. 790, 72 Sup. Ct. 1002, 96 L. Ed. 1302.

[24] *Id.* at page 799, the court majority stating:
". . . We are therefore reluctant to interfere with Oregon's determination of its policy with respect to the burden of proof on the issue of sanity since we cannot say that policy violates generally accepted concepts of basic standards of justice."

[25] *Id.*, Mr. Justice FELIX FRANKFURTER dissenting, at page 804:
". . . The laws of the forty-eight States present the greatest diversity in relieving the prosecution from proving affirmatively that a man is sane in the way it must prove affirmatively that the defendant is the man who pulled the trigger or struck the blow. Such legislation makes no inroad upon the basic principle that the State must prove guilt, not the defendant innocence, and prove it to the satisfaction of a jury beyond a reasonable doubt."

*Meeting the burden of proof.*

Defendant contends that as a matter of law he met the burden of proof of establishing his insanity under the ALI test. As would be anticipated, there was a definite conflict between the expert witnesses who testified as to whether or not the defendant was insane at the time of the crime. One psychiatrist, called by the defense, testified that the defendant was insane, but, on cross-examination, testified that he believed that the defendant "knew what he was doing when he killed these people," that he intended to pull the trigger, knew the consequences of so doing and knew that the killing was wrong. Another psychiatrist, called as a defense witness, testified the defendant was insane at the time of the crime, also testifying that a hypothetical person under the facts of the case would have had to have enough control to plan and execute the act. Another defense psychiatrist, who examined the defendant on February 19, 1963, testified that in his opinion defendant was insane at the time of the crime, although conceding that on the day of the examination he was unable to diagnose the defendant's condition. A psychiatrist testifying for the state, stated in answer to a hypothetical question, that it was very probable that the hypothetical person described knew the wrongfulness of his criminal act. Two medical witnesses, one a psychologist, the other a physician, testified in answer to the same hypothetical question, that the person described did not lack substantial capacity to appreciate the criminality of his acts, but had no opinion on whether such person could conform his conduct to the requirements of law. The clinical psychologist at Central State Hospital for six years testified, on the basis of tests and interviews with the defendant, that he was not insane as defined by the ALI test of insanity. The conflict in expert testimony is apparent. The question of which

experts were to be believed was for the jury to determine.[26]

*Questions asked by experts.*

The defendant objects to defense medical experts having been asked on cross-examination whether in their opinions the defendant would have killed the five persons "if a policeman had been present." When the question was first asked, there was no objection to it. When it was repeated, addressed to a different witness, objection was made, but overruled, the trial court noting that the same question had been asked, without objection being made, of an earlier witness. When the question was repeated later on in the trial, there was no objection. While an objection need not be repeated, it must be prompt. The failure to object to the initial question constitutes waiver.[27] Also, in the area of cross-examination of expert witnesses, some leeway is to be given,[28] since the expert witness should be able to state whether he is

---

[26] ". . . The issue as to sanity remained for resolution by the trier of fact. The issue of credibility of witnesses and of whether the defendant had met his burden of proof in establishing the defense of insanity was for the jury to determine. . . . The question of whether the defendant had met his burden of proof was one of fact for the jury, not one of law for the court." *State v. Bergenthal* (1970), 47 Wis. 2d 668, 685, 686, 178 N. W. 2d 16.

[27] "It is one of the most elementary rules of evidence that an objection must be made as soon as the opponent might reasonably be aware of the objectionable nature of the testimony . . . ." *Collier v. State* (1966), 30 Wis. 2d 101, 104, 140 N. W. 2d 252. *See also: Nadolinski v. State* (1970), 46 Wis. 2d 259, 268, 174 N. W. 2d 483.

[28] ". . . We are of the opinion that the jury will be best able to perform its function in dealing with this perplexing question if it is given all the information that qualified experts are able to give, even if such information does not fit nicely into the definition which the law has codified. For we are much impressed by the probability that no general standard can be devised that will satisfactorily fit all cases." *State v. Esser, supra,* at page 593.

able to answer the question in terms of the test or definition to which it is sought to relate it.[29] On the defense of lack of substantial capacity to appreciate the criminality of his acts or to conform his conduct to the requirements of law, permitting the question to be asked was not an abuse of discretion which is the test.[30]

*Right to change of venue.*

Defendant claims error in the trial court's refusal to grant a change of venue from Brown county, scene of the crime and place of the trial. A motion for change of venue was made on May 28, 1968, and denied subject to right to renew after the *voir dire* examination had been conducted. The motion was renewed on September 13, 1968, and was denied.

Relevant factors in determining whether a motion for change of venue should have been granted by a trial court include: the inflammatory nature of the publicity concerning the crime; the degree to which adverse publicity permeated the area from which the jury panel would be drawn; the timing and specificity of the publicity; the degree of care exercised; the amount of difficulty encountered in selecting the jury; the extent to which jurors were familiar with the publicity; the defendant's utilization of challenges, both peremptory and for cause, available to him on *voir dire;* the participation of the state in the adverse publicity; and the severity of the offense charged and the nature of the verdict

[29] ". . . We do not say that a qualified expert should not be permitted to state his opinion of the effect of defendant's mental illness on his capacity to distinguish right from wrong. But neither should his opinion nor the observations on which he bases it, be excluded as of no probative value if he says he is unable to state it in terms of the accepted definition." *State v. Esser, supra,* at page 593.

[30] *Stetson v. State* (1931), 204 Wis. 250, 256, 235 N. W. 539; 22 Corp. Jur. 723, notes 95, 96, and cases cited.

returned.[31] If there is a reasonable likelihood that a fair trial cannot be had, it is an abuse of discretion to deny a motion for a change of venue.

Newspaper articles accompanying defendant's motion for change of venue fall into two principal categories: those appearing at the time of the crime in 1963; and those relating to the return for trial and the preliminary hearing in 1967 and 1968. Those in the first category appeared five and one-half years prior to the trial. This fact of the passage of time of itself would dilute and diminish the likely effect of the press accounts, especially so in these days of daily exposure to kaleidoscopically changing vignettes of press-reported human events, tragedies and mishaps from around an entire globe. It must be granted that an account of the killing of five members of one family at one time would attract special reader interest as well as press attention, but this would likely be a statewide phenomenon, and it cannot be argued that one who kills five people, instead of just one, has insulated himself against prosecution wherever wire services carry the account of the crime.

More troublesome are the press stories dealing with the preliminary hearing. Not because there is anything inherently inflammatory or prejudicial in accounts of a preliminary hearing, required by law to be a public proceeding, but because the preliminary hearing stories included publication of information relating to the defendant's having given several confessions to the police and district attorney. Publication of the fact that such confessions were held inadmissible (under a retroactive application of the *Miranda* [32] mandate), does not change the revelation that the defendant had confessed to the crime. However, it is clear that no statements of any

[31] *McKissick v. State* (1971), 49 Wis. 2d 537, 182 N. W. 2d 282.
[32] *Miranda v. Arizona* (1966), 384 U. S. 436, 86 Sup. Ct. 1602, 16 L. Ed. 2d 694.

kind were made by the prosecutor as to statements made by the defendant, so we deal solely with the factual reporting of what transpired at the preliminary hearing. The content of the inculpatory statements made by defendant was not referred to in the press accounts. These factors, in addition to what the trial court described as the relative ease with which the *voir dire* examination was conducted and the jurors selected, and the court's statement in the record that it was not necessary to excuse many members of the jury panel for opinions they had formed, lead us to find that denial of the motions for change of venue was proper.

Using a "reverse English" approach, defendant adds the argument that the excusing of panel members who had formed opinions tended to eliminate the "well-read" members of the panel. This complimentary reference to those excused from jury service is not here entirely appropriate. As to the bulk of the press coverage complained of, it is those with the longest memories and sharpest recollections who were excused. However, jurors are not excused for cause for being newspaper readers or even for having formed an opinion from such reading. It is only when they are unable to lay aside an opinion deriving from press publicity and render a verdict on the evidence as presented that they are excused for cause.[33]

*Admission of certain evidence.*

Claim of trial court error is made as to the admitting of certain items into evidence during the guilt phase of

[33] *State v. Nutley* (1964), 24 Wis. 2d 527, 546, 129 N. W. 2d 155, citing *Irvin v. Dowd* (1961), 366 U. S. 717, 723, 81 Sup. Ct. 1639, 6 L. Ed. 2d 751:

" 'To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.' "

the trial. The items of evidence admitted were as follows:

1. *The weapons used.* The state offered into evidence an automatic rifle and a revolver, alleged to be the death weapons. The rifle was discovered and taken from the scene of the crime. The revolver was found buried in the snow where his friend had seen the defendant bury a bundle on the night of the crime. During a police interrogation, the defendant identified them as the weapons used and initialed them. When confessions made during the interrogation were held to be inadmissible for failure to give the *Miranda* warnings, the court ordered the initials placed on the weapons covered with masking tape. The guns were admitted, but the jury was not made aware of any initialing and the guns were not allowed to be taken to the jury room. We see no merit to the contention that the weapons themselves were inadmissible, or that the use of masking tape would create prejudicial speculation on why the tape was there.

2. *Evidence secured at the scene of the crime.* Error is claimed in the admission of items of evidence found in the home when the bodies were discovered. The police entry into the home after observing what appeared to be bodies lying on the floor clearly was reasonable.[34] No search, much less a search warrant, was required for the seizure of articles in plain view when they entered.[35]

[34] ". . . It was reasonable for them to conclude that a serious crime had been committed. . . . They had the responsibility, as well as the right, as law enforcement officers to enter the premises and were not required to seek and secure a search warrant before so doing. . . ." *State v. Davidson* (1969), 44 Wis. 2d 177, 194, 170 N. W. 2d 755.

[35] ". . . 'A search implies a prying into hidden places for that which is concealed.' It is not a search to observe what is in plain view. . . ." *Edwards v. State* (1968), 38 Wis. 2d 332, 338, 156 N. W. 2d 397. *See also: Harris v. United States* (1968), 390 U. S. 234, 236, 88 Sup. Ct. 992, 19 L. Ed. 2d 1067.

The contention that the bullet slugs not in plain view, and that the rifle recovered was in a gun case, therefore, not in plain view, is devoid of merit. A plainly visible bullet hole and a plainly visible gun case require no search or search warrant to extract the bullet slug or to obtain possession of the gun that is in the gun case. A lawful seizure, not an unlawful search, brought the slugs and rifle into police possession. The defendant's contention that the factor of time involved made seizure of the evidence without a warrant unlawful is without merit. Where the police work of lawfully collecting and preserving evidence of the crime committed is a continuing type operation, there is no court-imposed time limit on its completion. The test is reasonableness, and that test was here met.

*In the interests of justice.*

The request of defendant for reversal in the interest of justice rests largely upon the objections raised by him and above considered and found insufficient as a basis for reversal for error. In any event, reversal in the interest of justice requires a finding that ". . . it is probable there has been a miscarriage of justice. . . ." [36] We find no miscarriage of justice suggested, much less made probable by the record here.

*By the Court.*—Judgment affirmed.

[36] *Lock v. State* (1966), 31 Wis. 2d 110, 118, 142 N. W. 2d 183.