STATE of Wisconsin, Plaintiff-Appellant-Petitioner,

v.

Aaron P. DOUGLAS, Defendant-Respondent.

Supreme Court

*No. 84–453–CR. Argued October 31, 1984.—Decided April 3, 1985.*

(Also reported in 365 N.W.2d 580.)

---

For the plaintiff-appellant-petitioner the cause was argued by *Barry M. Levenson,* assistant attorney general, with whom on the briefs was *Bronson C. La Follette,* attorney general.

For the defendant-respondent there was a brief by *David H. Bennett, Milton Rosenberg* and *Bennett and Bennett,* Portage, and oral argument by *Mr. Rosenberg.*

DAY, J.  This is a review of an unpublished decision of the court of appeals affirming a pretrial order of the Circuit Court for Sauk County, Honorable J.R. Seering, Circuit Judge, suppressing admission into evidence of a written note found on the defendant's bedroom floor by police approximately forty-five hours after their initial permissive entry into the defendant's home.  The issue on review is: If the defendant impliedly consent-

ed[1] to a search of his home by police, did they need a warrant to reenter that home for further investigation approximately forty-five hours after the implied consent was given and twenty-two and one-half hours after other investigative activities in the home had ceased?

We hold that under the circumstances of this case, the state did need a warrant to reenter the defendant's home and that evidence seized in such subsequent reentry was properly suppressed by the trial court. We therefore affirm the court of appeals decision which sustained the trial court's action.

Shortly after 9:00 p.m. on the night of Monday, November 7, 1983, the defendant, Aaron Douglas, placed a phone call on the 911 emergency number and requested police assistance at his home. When asked what the problem was, the defendant responded, "I shot my mother." Later in that conversation, the defendant said he "killed everyone"; that he had also shot his two sisters and said, with respect to all three victims, "They're dead. Hurry." When asked if he wanted the police to come down to the basement of the home where he was, the defendant said, "Tell them to come down here." Pursuant to the defendant's request, the police entered the defendant's home and found the slain bodies of the defendant's mother and two sisters. The defendant was taken into custody by police.

Technicians from the Wisconsin State Crime Laboratory were called and arrived at 11:50 p.m. and stayed on the scene until 3:30 a.m. the following morning, No-

---

[1] *Black's Law Dictionary 276* (rev. 5th ed. 1979), defines express and implied consent as follows:

"*Express Consent.* That directly given, either *viva voce* or in writing. It is positive, direct, unequivocal consent, requiring no inference or implication to supply its meaning."

"*Implied Consent.* That manifested by signs, actions, or facts, or by inaction or silence, which raise a presumption that the consent has been given."

vember 8, 1983. The police returned about 6:30 a.m. on November 8th to remove the bodies. The crime laboratory technicians also returned later that day to continue their investigation and left the house for the last time at approximately 8:00 p.m. that night.

The following evening, Wednesday, November 9, 1983, at 6:30 p.m., two police officers returned to the defendant's home to review the scene of the crime and to "recreate" from the known facts the sequence of events that culminated in the slayings. In the defendant's bedroom, the officers found and seized a handwritten note which was lying in an open area of the bedroom floor. In its pretrial order, the trial court ordered that evidence of the note be suppressed.[2]

Guards had been placed at the front and rear entrances of the defendant's home on the night of November 7th. Those guards remained at the time until about 8:00 p.m. the night of November 9th.

No search warrant was ever obtained or sought.

In its memorandum decision filed February 3, 1984, on the defendant's pretrial motion to suppress as evidence the note seized on November 9, 1983, the trial court held that the entry into the defendant's bedroom on November 9th was in violation of the defendant's constitutional rights under the fourth amendment and suppressed the evidence. The state appealed pursuant to sec. 974.05(1)(d)1 and 2, Stats. § 1981–82.[3] In its

---

[2] The note was an untitled list of five items with a sixth entry left blank:

"1  no parents
"2  no sisters
"3  super—'looks'
"4  decent looking & running car
"5  good paying easy job
"6                              "

[3] "974.05. State's appeal. (1) Within 45 days of entry of the judgment or order to be appealed and in the manner provided for

decision filed June 15, 1984, the court of appeals affirmed that portion of the trial court's order which dealt with the note seized November 9, 1983. The defendant is awaiting trial on three counts of first-degree murder in violation of sec. 940.01.[4] This court accepted review to determine whether the November 9th reentry of the defendant's home by police violated his constitutional rights.

The fourth amendment to the United States Constitution provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

"[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed. . . ." *United States v. United States District Court,* 407

---

civil appeals under chs. 808 and 809, an appeal may be taken by the state from any: . . . (d) Order or judgment the substantive effect of which results in: . . . 2. Suppressing evidence; or 3. Suppressing a confession or admission."

Note: Section 974.05(1) was modified by 83 Wis. Act 219 which provides:

"Section 45. 974.05(1) (intro.) of the statutes is amended to read:

"974.05(1) (intro.) Within the time period specified by sec. 808.04(4) and in the manner provided for civil appeals under chs. 808 and 809, an appeal may be taken by the state from any:

"Note: The appeal deadline of sec. 974.05(1), stats., is not changed but is replaced by a reference to sec. 808.04(4), stats., for ease of reference."

[4] "940.01. First-degree murder. Whoever causes the death of another human being with intent to kill that person or another is guilty of a Class A felony.

"(2) In this chapter 'intent to kill' means the mental purpose to take the life of another human being."

U.S. 297, 313 (1972). A basic principle of fourth amendment law is that searches and seizures inside the home without a warrant are presumptively unreasonable. *Payton v. New York,* 445 U.S. 573, 586 (1980). Because, in the instant case, the house searched was the defendant's home and because he was the one against whom the search was directed, the defendant has standing to challenge the lawfulness of the search. *Bumper v. North Carolina,* 391 U.S. 543, 548, n. 11 (1968). The defendant had a reasonable expectation of privacy in his home. *Katz v. United States,* 389 U.S. 347, 361 (1967) (Harlan, J., concurring).

One of the established exceptions to the warrant and probable cause requirements is a search conducted pursuant to consent. *Schneckloth v. Bustamonte,* 412 U.S. 218, 219 (1973). The defendant does not dispute that the initial entry into his house was with his consent. The issue is whether the state could justifiably rely upon that consent to reenter the defendant's home without a search warrant on the evening of November 9, 1983, approximately forty-five hours later.

This court had occasion to pass on the effect of an earlier implied consent to search on a second search made less than twenty-four hours later in *Kelly v. State,* 75 Wis. 2d 303, 308–309, 249 N.W.2d 800 (1977). In that case, the defendant told a neighbor that "a man had been shot" at her place of residence. The defendant then went to another neighbor's house and that neighbor called the police. *Kelly,* 75 Wis. 2d at 307. That evening, the police went into the home which the defendant and the victim shared, they discovered the body of the victim and they took the defendant into custody shortly thereafter. The police then made "a complete search inside the house." *Kelly,* 75 Wis. 2d at 308. In the afternoon of the next day, the police returned and again searched the home. The home had been guarded through the

night. *Kelly*, 75 Wis. 2d at 309. As in the case at bar, no warrant to search the home was ever obtained. The defendant moved to suppress the evidence seized. *Kelly*, 75 Wis. 2d at 304.

This court, in *Kelly*, upheld the trial court's conclusion that under the facts and circumstances, the defendant had given her consent to this first search of the premises. *Kelly*, 75 Wis. 2d at 311. This court stated:

"Under such circumstances there was an implied consent not only to aid the victim but to determine what had caused the death or injury and who was responsible . . . In the case before us the presence of the officers was by the implied consent of the defendant, not only to help the victim but to investigate." *Kelly*, 75 Wis. 2d at 313.

However, this court, in *Kelly*, also upheld the trial court's conclusion that although the implied consent justified the warrantless search of the home on the night that consent was given, this consent did not carry over to justify another warrantless search of the home by police on the following day. *Kelly*, 75 Wis. 2d at 313.[5]

As in *Kelly*, the consent to search the home given in the instant case was implied from the conduct of the defendant. The trial court in the case before us, in finding that the defendant impliedly consented to a search of his home, focused on several factors. First, the defendant summoned the police to his home when he called for police assistance on the 911 emergency number. Second, in that telephone conversation the defendant said that he had killed his mother and that he had "killed

---

[5] Contrary to the assertions of the dissent at p. 31, we do not dispute that there was an express consent to go into the home and into the basement where the defendant was. Any consent to enter and search the home in the furtherance of a criminal investigation, was, however, implied from the circumstances.

everyone." Third, during that conversation the defendant, who was in the basement of the home, said the police should "bring some water when they come down here." Fourth, in response to the dispatcher's question of whether the defendant wanted the police to enter the house and go to the basement where he was, the defendant said, "Tell them to come down here." As in *Kelly*, these facts amounted to an implied consent to enter and search the house.[6] Under *Kelly*, however, the state cannot rely upon the implied consent of November 7th to justify a second search of the defendant's home on November 9th, almost two full days after that consent was given.

The state argues that *Kelly* is distinguishable. First, because, in *Kelly*, the second search was broader in scope than the first. Second, because the defendant's status changed with her becoming a suspect between the two searches. We disagree. There is no indication in *Kelly* that this court considered those factors relevant in determining that the implied consent would not justify the second search. With respect to the scope of the second search in *Kelly*, it is doubtful that it was broader than the scope of the first search since that first search involved "a complete search inside the house." *Kelly*, 75 Wis. 2d at 308. With respect to the status of the defendant changing, it is apparent that at the least, she was a suspect almost immediately after police entered the home. This is not substantially different from this case in which the defendant became a suspect when he placed his call to the police. We conclude that the same factors that militated against receipt of the evidence found in a second search in *Kelly* preclude the admission of evidence discovered by the officers when they again en-

---

[6] In *Kelly v. State*, 75 Wis. 2d 303, 316, 249 N.W.2d 800 (1977), this court held that the admission into evidence of the evidence seized in the second search was harmless error.

tered the home at the time in question in the instant case.[7]

The defendant's consent was implied and authorized and justified the search made at that time. But such authorization is not perpetual. The courts, including this one, have scrutinized with the greatest care claims by the state to the use of evidence seized in warrantless searches of one's home. In *Boyd v. United States*, 116 U.S. 616, 635 (1886), the United States Supreme Court gave the following admonition:

"It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon."

That principle is no less true today than it was a century ago. The fourth amendment has been liberally construed to protect the security of person and property when exceptions to the warrant requirement are sought.

---

[7] The state cites cases from other jurisdictions which are distinguishable from the instant case. *State v. Koucoules*, 343 A.2d 860 (Me. 1974), involved an express consent to search and the search was a continuous though temporarily recessed search during the course of a single day. *Gray v. State*, 441 A.2d 209 (Del. 1982) also involved an express consent and did not involve a search of the defendant's home. *People v. Trujillo*, 576 P.2d 479 (Col. 1977) involved the search of an automobile and an express consent to search. *Commonwealth v. Cantaloupo*, 402 N.E.2d 1040 (Mass. 1980), involved an express consent to search and did not involve a question of time.

Such exceptions are "jealously and carefully drawn." *Jones v. United States,* 357 U.S. 493, 499 (1958).

The rule is clear, absent exigent circumstances or consent, evidence seized in warrantless searches of one's home is not admissible. Here the exigent circumstances had long since disappeared. The question then is, did the permission given in the initial consent still hover over the premises or had it evaporated in the two sun rises that intervened?

A consent search is constitutionally reasonable to the extent that the search remains within the bounds of the actual consent. *United States v. Dichiarinte,* 445 F2d 126, 129 (7th Cir 1971). Giving the fourth amendment its usual construction, it would be inappropriate to conclude that an implied consent, which has no express bounds, is boundless. To refuse to allow the state to rely upon an implied consent to justify another investigative intrusion into the house almost two full days after that consent was given is consistent with the basic principles of fourth amendment law. We conclude that the passage of time from the consent and the lack of a showing that circumstances prevented or made impractical the obtaining of a search warrant in the instant case, vitiated the initial implied consent as to the reentry of the defendant's home almost two days after that consent was given. Absent a warrant, the burden is on the state to show circumstances which demonstrate that the consenting party intended to consent to such an investigative intrusion. The state has made no such showing here.

The state contends that the reentry on November 9th was not a second search but a continuation of the lawful initial search. Therefore, the state argues, under this court's decision in *State v. Hebard,* 50 Wis. 2d 408,

430, 184 N.W.2d 156 (1971), there should be no court imposed time limit on the completion of the search.[8]

Whether a subsequent investigative intrusion is a continuation of a lawful initial entry to search can only be determined in light of the facts and circumstances of each case. *LaFournier v. State*, 91 Wis. 2d 61, 70, 280 N.W.2d 746 (1979). The state argues that because the November 9th reentry did not expand the scope of the original entry and search and because the defendant's home was secured by police from November 7th through November 9th, the November 9th reentry was only a continuation of the initial lawful entry to search of November 7th.[9]

Time, however, is an additional factor to consider in determining whether a reentry is simply a continuation of an initial lawful entry and search. In *LaFournier,* this court held that a subsequent warrantless entry by police within minutes after the officer making the initial entry had left the scene was a continuation of the lawful initial warrantless entry. *LaFournier,* 91 Wis. 2d at 69. This court said in so holding:

"We conclude that in the instant case the successive intrusion of Weiland and the three officers were close in time and practically identical in nature so as to be analytically and factually inseparable." *LaFournier,* 91 Wis. 2d at 70.

In the instant case, the factor of time is dispositive on the issue of continuation. Assuming for purposes of this review that the continuing initial search was in progress until 8:00 p.m. of November 8th, an interrup-

[8] Because we conclude that there were two separate searches, we do not address the issue of whether a single continuous search based upon an implied consent could last two or more days.

[9] It should be noted that in *Kelly,* discussed above, the home was also guarded between searches. *Kelly,* 75 Wis. 2d at 309.

tion in investigative activities until 6:30 p.m. of November 9th made the November 9th reentry factually and analytically separable. It would be contrary to the "liberal" construction to be given the fourth amendment to allow, under the guise of continuation, such separable warrantless intrusions into the home over an indefinite period simply because the initial search was broader in scope and because police were guarding the premises. If the warrantless reentry of the home occurs twenty-two and one-half hours after other investigative activities in the home have ceased, the rule of continuation will not be applied to avoid the warrant requirement without a showing by the state of overriding circumstances which would justify such application. The state has made no such showing in this case.[10]

Finally, the state contends that what occurred on November 9th was not a search for fourth amendment purposes, but was simply an attempt to reconstruct the events of November 7th which resulted in the discovery of a note which was in plain view. The state cites *State v. Girdler*, 675 P. 2d 1301 (Ariz. 1983), for the proposition that a re-creation of events is not a search under the fourth amendment. *Girdler*, however, is distinguishable because it involved an out-of-doors re-creation of events in an area that was open to the public. *Girdler*, 675 P. 2d at 1306. In *Girdler*, the defendant did not have a reasonable expectation of privacy in that area.

[10] In *Michigan v. Tyler*, 436 U.S. 499 (1978), fire department officers left the premises they were investigating for arson and returned approximately four hours later. They continued their investigation without a warrant. The Supreme Court, in holding that the entry four hours later was a continuation of the initial entry, focused on the fact that the investigation was severely hindered during the initial entry "by darkness, steam and smoke." The instant case is distinguishable based upon both the length of the interruption and the lack of such hindering factors.

Since reentry for investigative purposes was not justified by consent, exigent circumstances or a warrant, it was unreasonable under the fourth amendment. In *Payton v. New York*, 445 U.S. at 576, the Supreme Court held that the fourth amendment prohibited police from making a warrantless non-consensual entry into a suspect's home in order to make a routine felony arrest. In so holding the Court said:

"But the critical point is that any differences in the intrusiveness of entries to search and entries to arrest are merely ones of degrees rather than kind. The two intrusions share this fundamental characteristic: the breach of the entrance to an individual's home. The Fourth Amendment protects the individual's privacy in a variety of settings. In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home— a zone that finds its roots in clear and specific constitutional terms: 'The right of the people to be secure in their . . . houses . . . shall not be violated.' That language unequivocally establishes the proposition that '[a]t the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.' *Silverman v. United States*, 365 U.S. 505, 511. In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant."

The entry of the defendant's home by police for purposes of recreating the events of a crime also involves that same fundamental characteristic: the breach of the entrance to the individual's home. Although the note may have been in plain view in the defendant's bedroom, the state was required to have a warrant to even cross

the threshold of the defendant's home to continue the investigation on November 9th.

The implied consent of the defendant in this case did not serve as a waiver of his expectation of privacy in his home with respect to a subsequent investigative intrusion on November 9, 1983. Since no warrant was sought and since no exception to the warrant requirement independent of the implied consent has been offered to justify the November 9th search, the evidence seized as a result of the November 9th entry was properly suppressed by the trial court.

*By the Court.*—The decision of the court of appeals is affirmed.

SHIRLEY S. ABRAHAMSON, J. (concurring). Unless the police entry to the home on November 9 occurred with the defendant's consent, the entry violated the fourth amendment and the seizure of the evidence must be suppressed. Unless the police were legally on the premises on November 9, the doctrine of plain view is not applicable. Unless the defendant consented to the November 9 entry, the defendant had a reasonable expectation of privacy regarding his bedroom.

On this review the parties apparently agree that on November 7 the defendant consented to the police entry into his home and that the police entered the home on November 7 pursuant to this consent. The question is whether the defendant's consent to the police entry given on November 7 included consent to the police entry into the home on November 9. Whether the defendant consented to the November 9 entry is determined by interpreting the scope of the defendant's consent, that is, determining whether defendant's consent given on November 7 limited the duration or area of the police entry. A search based on consent may not exceed the limits of the consent. *See A Model Code of Pre-Arraignment Procedure,* sec. 240.3(1), p. 150, Commentary pp.

537–38 (1975). Thus this case turns on whether the defendant's consent carried express or implied limitations regarding such matters as duration or area. In short, the issue is not one of the express or implied nature of the November 7 consent, but the nature of the express or implied or legal limitations—if any—on the scope of that consent. I do not join the majority opinion because I do not understand its use of the terms actual, authorized, express and implied consent.

The trial court found as a matter of fact that the "defendant, by words and conduct, clearly invited police officers to enter his home [on November 7]." The trial court further found as a matter of fact that "at no time did the defendant consent to a search of his bedroom on November 9th."

Interpretation of the scope of the defendant's consent, whether consent is given by word or conduct, may be viewed as a question of law or fact, depending on the circumstances of the case. The scope of the appellate court's review of the trial court's decision regarding the scope of the defendant's consent depends on the appellate court's characterization of the issue.

In this case, whether I characterize the issue of the scope of the defendant's consent as one of fact, law, constitutional fact, or mixed question of fact and law, I conclude that the trial court reached the correct decision. The defendant's consent on November 7 to the police entry to all or part of the house, whether viewed as a matter of the defendant's intent, of the police's reasonable expectations, or of law, did not extend to the police's entry approximately forty-five hours after the initial entry and twenty-two and one-half hours after investigative activities in the home had ceased. As is apparent in *Kelly v. State,* 75 Wis. 2d 303, 313, 249 N.W.2d 800 (1977), consent to enter or search is usually given with the understanding that the entry or search will be conducted promptly and that only a single entry

or search will be made. See 2 W.R. LaFave, *Search and Seizure,* sec. 8.1(c), at 632 (1978) and 275–76 (1985 Pocket Part).

Like the majority, I would affirm the decision of the court of appeals.

STEINMETZ, J. (*dissenting*). I disagree with both the result of the majority decision and its analysis.

The facts in this case are that at approximately 9:09 p.m. on November 7, 1983, the defendant called the Sauk County Sheriff's Department via the 911 emergency telephone number. He told the sheriff's dispatcher he shot his mother and "killed everyone" in the house. He also told the dispatcher the following:

"Yes, would you please send me the police . . . send them to Reedsburg. . . . 554 Reed Street. . . .

"I went down to the basement and got my gun and I killed everyone. . . .

"Hurry. When are the cops gonna be here? . . .

"Tell 'em I'm in the basement. . . .

"I'm gonna go outside if they don't get hurrying. . . .

"I started one. It's real small. It's going out. Don't worry, it's just a small folk—smoke fire. . . .

"Tell 'em to bring some water down when they come down here though. . . .

"Tell them to come down here."

The sheriff's department notified the Reedsburg Police Department. Shortly after the Reedsburg police arrived, the defendant left the home through the front door. He stated: "Oh what have I done, what have I done?" and appeared shaken and was either sobbing or crying. He voluntarily surrendered to the police.

The Sauk County Sheriff's Department arrived shortly thereafter. After placing the defendant under arrest, Captain Wilbur Abel of the Reedsburg Police Department and Detective Randy Stammen of the Sauk County Sheriff's Department entered the house and discovered

the mutilated bodies of the defendant's mother and two sisters. The record discloses the officers then proceeded to quickly check the remaining rooms, closets, basement and garage "to see if anyone was hurt, or if there was anyone else in the house." Without removing anything, the two officers left the house and placed it under 24-hour guard.

At 11:50 p.m. that same night technicians from the Wisconsin State Crime Laboratory arrived. They remained inside the Douglas home gathering evidence until nearly 3:30 a.m. and left unfinished. Deputy Terry Spencer of the Sauk County Sheriff's Department video-taped the scene.

At 6:30 a.m. on November 8, Captain Abel returned to the house to assist the coroner in removing the bodies for transport to Madison and then accompanied the bodies to Madison. Later that day, employees from the state crime laboratory returned to the house to complete their investigation and remained until 8:00 p.m. the night of November 8. Numerous items of physical evidence were removed during this period. Captain Abel did not return to Reedsburg until late that day.

At approximately 6:30 p.m. on November 9, Captain Abel and Detective Stammen returned to the house to reconstruct the events of the evening of November 7. Captain Abel testified he returned to the house because, "We had been gone virtually all the time since the morning following the killings," and he stated "We hadn't completed our investigation." He added: "We wanted to look the scene over again and to try to ascertain in our own minds what had happened in the house that night. . . . We were recreating the crime." While in defendant's bedroom, the officers discovered a note on the floor. This note was taken in evidence and was suppressed by the trial court, which action has been affirmed by the court of appeals and the majority's decision. Captain Abel and Detective Stammen left the

premises at approximately 8:00 p.m. that evening. The guarding of the home which had been continuously in effect since the night of November 7 was discontinued at that time.

## A. CONSENT

Throughout the opinion the majority labels the defendant's consent to enter and search his family's home as implied. I believe Douglas's consent was expressly given, not impliedly. The majority relies on *Kelly v. State,* 75 Wis. 2d 303, 249 N.W.2d 800 (1977), in which the court justified the entry and search of the victim's home on the implied consent of the defendant. In *Kelly,* the court concluded implied consent was given because the defendant's statements led the police to believe the victim had shot himself or been shot by someone other than the defendant and that he was running around outside and in need of help. The defendant after the shooting walked down the road and told her neighbor "a man had be shot" while she was in the bedroom. That neighbor and the defendant went to Eugene Biettler's house and the defendant told him "her boyfriend had been shot and was running around outside." Eugene Biettler then called the police for assistance. Through her actions and statements the defendant impliedly consented to the entry and search of her home. The court stated: "Under such circumstances there was an implied consent not only to aid the victim but to determine what had caused the death or injury and who was responsible." *Id.* at 313. It was these circumstances that formed consent impliedly given. According to Black's Law Dictionary 276 (rev. 5th ed. 1979), implied consent is manifested by signs, actions, or facts, or by inaction or silence, which raise a presumption that the consent has been given.

Contrary to the majority's decision, and unlike *Kelly*, in the instant case the defendant's actions and statements manifest an expressly not impliedly given consent. Black's Law Dictionary 276 (rev. 5th ed. 1979), defines express consent as being directly given, either *viva voce* or in writing. It is positive, direct, unequivocal and requires no inference or implication to supply its meaning. The trial court found the following fact beyond a reasonable doubt: "That defendant, by words and conduct, *clearly invited police officers to enter his home*" and in the addendum to its memorandum decision the trial court added "he *specifically* invited the police into his home." (Emphasis added.) The defendant stated to police, among other things:

"Yes, would you please send me the police . . . send them to Reedsburg . . . 554 Reed Street. . . .

"Tell 'em I'm in the basement. . . .

"I started one. It's real small. It's going out. Don't worry, it's just a small folk-smoke fire. . . .

"Tell 'em to bring some water down when they come down here though. . . .

"Tell them to come down here."

These statements positively and unequivocally invited the police to enter the home to extinguish the fire set by the defendant and assist the victims. No inference is needed to arrive at the conclusion that Douglas expressly consented to the entry of his home, and the trial court's finding of fact that the defendant "clearly invited police officers to enter his home" is not against the great weight and clear preponderance of the evidence.

Having stated that this case involves expressly given rather than impliedly given consent, the distinction vanishes with respect to the second question as to the scope of Douglas's consent. The manner in which consent is given, whether impliedly or expressly, is a difference

without a distinction on the issue of the spatial and temporal scope of the consent. Once the consent is given, it does not matter whether it was expressly given or whether it was given by implication; what matters is not the means chosen to give the consent, but the meaning of the consent as reflective of the consenting party's intent.

The majority would have us believe that once we label the manner in which the consent was given as "implied," the intent of the consenter, here Douglas, in terms of his spatial and temporal limitations is likewise restrictively implied now by law. At p. 22 of the majority opinion, the majority states "Giving the fourth amendment its usual construction, it would be inappropriate to conclude that an implied consent, which has no express bounds, is boundless." The majority stops short in its analysis of this case. It concludes Douglas impliedly consented to the entry and search of his home and instead of questioning what Douglas intended, simply concludes implied consents further imply more restrictive temporal and spatial restraints on the police than expressly given consents. This simply does not follow, and the appropriate result is found upon a careful consideration of the total circumstances in the case.

## B.  VALID SEARCH AND SEIZURE

There is no reason to hold that the mere passage of time makes a subsequent entry unreasonable, but rather the total circumstances must be carefully considered in balancing the defendant's expectation of privacy against the state's interest in investigating and solving a major crime.

In *United States v. Knotts,* 460 U.S. 276, 280–81 (1983), the United States Supreme Court in quoting *Smith v. Maryland,* 442 U.S. 735, 740 (1979), stated the relevant fourth amendment analysis:

" '[T]his Court uniformly has held that the application of the Fourth Amendment depends on whether a person invoking its protection can claim a "justifiable," a "reasonable," or a "legitimate expectation of privacy" that has been invaded by government action. [Citations omitted.] This inquiry, as Mr. Justice Harlan aptly noted in his *Katz* concurrence, normally embraces two discrete questions. The first is whether the individual, by his conduct, has "exhibited an actual (subjective) expectation of privacy," 389 U.S., at 361—whether, in the words of the *Katz* majority, the individual has shown that "he seeks to preserve [something] as private." *Id.*, at 351. The second question is whether the individual's subjective expectation of privacy is "one that society is prepared to recognize as 'reasonable.' " *id.*, at 361— whether, in the words of the *Katz* majority, the individual's expectation, viewed objectively, is "justifiable" under the circumstances.' " (Footnote omitted.)

Under the facts of this case, Douglas did not exhibit an actual (subjective) expectation of privacy, nor did he seek to preserve something as private. More importantly, for the sake of argument, even if Douglas did exhibit an actual (subjective) expectation of privacy, it was not one which society is prepared to recognize as reasonable. That subjective expectation was not one that viewed objectively is "justifiable" under the circumstances of this case concluding in the November 9 reconstruction of his admitted crimes.

The defendant's statements and conduct on the night of November 7 clearly forfeited his expectation of privacy in his home. This allowed police to conduct a reasonable search of the premises and would have allowed the seizure of the note if it had been discovered that night. The majority never explains when or how the defendant's expectation of privacy which he surrendered to the police on November 7 was reinstated or reasserted. He admitted murdering three of the other residents of the house, his mother and two sisters, so he had eliminated their expectation of a right of privacy. The record

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

is silent as to whether the defendant's father, Richard Douglas, who arrived on the scene just prior to the defendant's surrender, wanted to enter the house or did in fact enter the house. The father conversed with Captain Abel in the street prior to the defendant's arrest and the record does not show whether he voiced any objection to the initial entry and search of his home nor when he eventually, if ever, returned to the home. The house at all times remained under the control and supervision of the Reedsburg Police Department. More importantly, Captain Abel testified no person was allowed access to the Douglas home after guards were posted.

The majority holds the passage of time vitiated the initial consent and that the interruption in investigative activities between 8:00 p.m. on November 8 until 6:30 p.m. on November 9 made the initial investigation and the subsequent investigation and reconstruction of the scene "factually and analytically separable." (Pages 12, 24.)

It is important to note that the killings took place in the city of Reedsburg, county of Sauk, which had populations of 5,038 and 43,469 residents, respectively, at the time of the last census.[1] It can be assumed that the police and sheriff's department for a county and especially a city of that size are limited and teams of specialists to be assigned for multiple killing cases, in this case a triple homicide, as might be available in large, populated urban areas simply do not exist.

Captain Abel of the Reedsburg Police Department coordinated the city police department's investigation and Detective Niles the sheriff's department's. Detective Niles interviewed the defendant shortly after he was taken into custody while Captain Abel remained at the scene of the crime. It was in that interview that the defendant stated the evening's events started in his bedroom while he

[1] According to report of National Census Bureau 1980.

was doing homework and that he thought about death and killing people. He told Detective Niles he went from his bedroom to the basement and then to where he had his deer hunting rifle. The interview lasted until 11:02 p.m. on November 7. Captain Abel still remained on the scene. It is reasonable that the statement had to be transcribed for accuracy and only then was Captain Abel privy to its contents. It is reasonable to infer based on Captain Abel's testimony that the earliest he would have been able to be privy to its contents would have been the morning of November 9. Moreover, it was reasonable that after hearing Douglas's statement Captain Abel and Detective Stammen in going to the house to reconstruct the crime would have started in the defendant's bedroom where the slip of paper was found in plain view on the floor and "lying in an open area of the bedroom." (Page 16.)

Captain Abel stated he remained on the scene on November 7 until approximately 3:30 a.m. and returned to accompany the bodies to Madison at approximately 6:30 a.m. Captain Abel then left for the state crime laboratory in Madison to accompany the evidence removed from the defendant's home and did not return home until late that day.

Captain Abel on November 9 would have had to, among other things, coordinate with Detective Niles of the sheriff's department what was known in the case. It is reasonable to assume that each of the officers had other duties which had accumulated over the previous 36 hours, so that it is not wholly unreasonable that he did not go to defendant's home until 6:00 p.m. on November 9 to reconstruct the crime. The majority's opinion is suspicious of whether Captain Abel and Detective Stammen went to Douglas's house to reconstruct the crime based on their combined knowledge received through the earlier investigation and the evidence obtained or

to continue a search. The record, however, indicates they went there to reconstruct the crime and that is consistent with the factual development in the case. After all, even the majority would have given the police the right to search the home on the night the bodies were recovered. Unfortunately, at that time the police did not know the defendant had thought about death and killing and had begun the tragic events of the evening in his bedroom.

Reconstruction of the crime is an ordinary and recognized practice of police investigation and it is done as much to see if the defendant really committed a crime he has confessed to as it is to determine whether the facts already known raise doubts about the defendant's admissions and declarations.

The privacy protected by the fourth amendment was described in *Boyd v. United States,* 116 U.S. 616, 630 (1886), as protection against all governmental invasions "of the sanctity of a man's home and the privacies of life." This hardly describes the circumstances of the instant case of a triple killing where the defendant has never returned to the home and the police have secured the house at all times.

Under the particular facts of this case, the majority places an improper burden on the state to show what prevented or made it impractical to obtain a search warrant for the November 9 entry into the house. (Pages 25 and 26.) The November 9 entry was made to reconstruct the crime, not specifically to look for known evidence. The grounds for obtaining a search warrant require the place to be searched and the thing to be seized to be described with particularity.[2]

Until the officers saw the slip of paper on the bedroom floor, they did not know of its existence and, therefore, could not have described it in a search warrant

---

[2] *See* 2 LaFave, W., Search and Seizure sec. 4.6 (1978).

application with any particularity or location. We stated in *State v. Noll,* 116 Wis. 2d 443, 450–51, 343 N.W.2d 391 (1984):

"The fourth amendment to the United States Constitution requires that a search warrant 'particularly describ[e] the place to be searched, and the persons or things to be seized.' The original purpose of the particularity requirement was to do away with the evils of the general warrant known to the colonists as the writ of assistance. These writs, which were issued on 'mere suspicion,' gave customs officials blanket authority to search wherever they pleased for any goods imported in violation of British tax laws. *United States v. Christine,* 687 F.2d 749, 755 (3rd Cir. 1982), 1 W. LaFave, *Search and Seizure* sec. 1.1 (1978). Today the particularity requirement prevents the government from engaging in general exploratory rummaging through a person's papers and effects in search of anything that might prove to be incriminating. *Coolidge v. New Hampshire,* 403 U.S. 443, 467 (1971); *State v. Starke,* 81 Wis. 2d 399, 413, 260 N.W.2d 739 (1977). In order to satisfy the particularity requirement, the warrant must enable the searcher to reasonably ascertain and identify the things which are authorized to be seized. *Steele v. United States,* 267 U.S. 498, 503 (1925); *United States v. Cook,* 657 F.2d 730, 733 (5th Cir. 1981). The use of a generic term or general description is constitutionally acceptable only when a more specific description of the items to be seized is not available. *United States v. Cook,* 657 F.2d at 733."[3]

This could not be done in this case since the police did not seek to search the bedroom; they were not looking for any evidence and clearly they had no idea the slip of paper found on the bedroom floor ever existed. To require a search warrant on November 9 is a constitutional impossibility and to suggest the lack of effort to

[3] *See also State v. Starke,* 81 Wis. 2d 399, 413, 260 N.W.2d 739 (1978); *Rainey v. State,* 74 Wis. 2d 189, 202, 246 N.W.2d 529 (1976).

obtain one is not worthy of statement as a reason for finding this entry unreasonable.

## C. CONCLUSION

The majority states: "In the instant case, the factor of time is dispositive on the issue of continuation" (page 23)[4] of the bridge between November 7, 8 and 9. That statement does not explain why the actual periods of time were improper or what the appropriate time limits for a proper entry are. I would not consider the factor of time as "dispositive," but rather, my belief that the seizure of the note was validated by a legitimate search is supported by a careful consideration of the total circumstances in the case. Confined to the particular facts of this case, I believe there were legitimate reasons for the interruption of investigation conducted in the Douglas home and the total circumstances in this case made the November 9 entry for the stated purpose reasonable. Since the police had a right to be in the defendant's bedroom on November 9, they had the right to take as evidence the slip of paper that was in plain sight. The police, according to the record, had only made a cursory check of defendant's bedroom on November 7. After that they had no reason to be there, that is until the defendant stated that the tragic events of November 7 began in his bedroom.

In *State v. Boggess*, 115 Wis. 2d 443, 448-49, 340 N.W. 2d 516 (1983), we stated:

"Both the fourth amendment to the United States Constitution and article I, sec. 11 of the Wisconsin Constitution proscribe unreasonable searches and seizures. The basic purpose of this prohibition is to safeguard the privacy and security of individuals against arbitrary

---

[4] At pages 25, 26, the majority again requires a search warrant for the November 9 entry.

invasions by government officials. *See Michigan v. Tyler,* 436 U.S. 499, 504 (1978)." (Footnote omitted.)

As the United States Supreme Court stated in *Terry v. Ohio,* 392 U.S. 1, 9, 12 (1968) in concluding a person is entitled to be free from unreasonable governmental intrusion:

"Of course, the specific content and incidents of this right must be shaped by the context in which it is asserted. For 'what the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures.' *Elkins v. United States,* 364 U.S. 206, 222 (1960). . . . [T]he rule excluding evidence seized in violation of the Fourth Amendment has been recognized as a principal mode of discouraging lawless police conduct."

The instant case does not involve lawless police conduct which requires discouraging. In *Terry,* at 13, the Court cautioned:

"The exclusionary rule has its limitations, however, as a tool of judicial control. It cannot properly be invoked to exclude the products of legitimate police investigative techniques on the ground that much conduct which is closely similar involves unwarranted intrusions upon constitutional protections. Moreover, in some contexts the rule is ineffective as a deterrent."

I find the application by the majority of the fourth amendment and resulting exclusionary rule in this case to be unwarranted and the police conduct on November 9 to have been a legitimate police investigative technique. The mere passage of hours under the total circumstances of this case did not create a violation of the fourth amendment. The November 9 visit by the police to reconstruct the scene of the crimes was not an arbitrary invasion by government officials.

I would reverse the court of appeals on the admissibility into the evidence the slip of paper as I find it to have been reasonably found by the police.

40

I am authorized to state that Justice William G. Callow and Justice Louis J. Ceci join this dissenting opinion.